UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

Thomas H. Herndon, Jr., Esq. (TH-9726)
Thomas H. Herndon, Jr., Law PLLC
and of Counsel to Weinstein + Klein P.C.
*Attorneys for Plaintiff*
*Knocking Inc.*
34 Crest Drive
South Orange, New Jersey 07079
Telephone No.: (646) 699-8814
Email: therndon@thhjrlaw.com
          therndon@weinsteinklein.com

Brian Klein, Esq. (BK-9467)
Weinstein + Klein P.C.
*Attorneys for Plaintiff*
*Knocking Inc.*
500 7th Avenue, 8th Floor
New York, New York 10018
Telephone No.: (347) 502-6461
Email: bklein@weinsteinklein.com

| | |
|---|---|
| KNOCKING INC.,<br><br>          Plaintiff,<br><br>     v.<br><br>CANDI CARTER, CISTUS MEDIA INC., COURTNEY SPENCER, and ANA PITCHER,<br><br>         Defendants. | **COMPLAINT**<br><br>Civil Action No.: _____<br><br>**<u>JURY TRIAL DEMANDED</u>** |

Plaintiff, Knocking Inc. ("Knocking" or "Plaintiff"), by and through its attorneys, Thomas

H. Herndon, Jr., Law PLLC, of counsel to Weinstein + Klein P.C., and Weinstein + Klein P.C., as

and for its complaint (the "Complaint") against defendants Candi Carter ("Carter"), Cistus Media

1

Inc. ("Cistus"), Courtney Spencer ("Spencer"), and Ana Pitcher (individually "Pitcher," and together with Carter, Cistus, and Spencer "Defendants"), alleges as follows:

## <u>NATURE OF THE ACTION</u>

1.      Plaintiff, Knocking, hired defendant, Carter, to serve as its chief content officer ("CCO") based upon her representations regarding her ability to expand and grow Plaintiff's relationship with media outlets and brand partners. Despite Carter's failure to perform, Plaintiff generously compensated Carter when the parties parted ways in 2024. Following their separation, rather than acting in good faith, Carter misappropriated marketing strategies Plaintiff developed to solicit business from the BET Network to pursue the same relationship through her newly formed competing entity, defendant Cistus. More troublingly, after her departure, Carter devised a scheme through which two (2) other employees of Plaintiff (*i.e.* the other individual Defendants herein), at least one (1) of whom had prior relationships with Carter and one (1) reported directly to Carter during her tenure at Knocking, continued to illicitly misappropriate Plaintiff's confidential information, regarding its brand partners, and relay the same to Carter and Cistus, for the purpose of undercutting Plaintiff through the unlawful use of its own confidential information, in violation of their contractual and fiduciary duties to Plaintiff. Through these bad acts, Carter brought Cistus to market and developed its BET webstore, to sell products from Plaintiff's brand partners, at Plaintiff's direct and proximate loss and expense.

2.      As a result of the foregoing, Plaintiff now commences this action and will move this Court for an order, *inter alia*, enjoining Defendants from further use of Plaintiff's confidential and proprietary trade secrets and compelling Defendants to destroy any such information, which they wrongfully obtained, as well as, damages stemming from Defendants' violation of the Defend Trade Secrets Act of 2016, 18 U.S.C. § 1836, *et seq.* (the "DTSA"), and in violation of New York

common law misappropriation of trade secrets and granting such relief against the co-conspirators, Cistus, Spencer, and Pitcher, for aiding and abetting and conspiring with Carter to misappropriate trade secrets. Plaintiff further seeks damages, in the alternative, for: (a) tortious interference with contract against Carter; (b) tortious interference with prospective economic relations against all Defendants, (c) unjust enrichment against Cistus; (d) breach of contract against Carter, Spencer, and Pitcher; (e) breach of duty of loyalty against Spencer and Pitcher; and (f) breach of covenant of good faith and fair dealing against Carter, Spencer, and Pitcher.

## THE PARTIES

3.     Plaintiff, Knocking Inc., is a corporation, engaged in the marketing and e-commerce business, organized under the laws of the State of Delaware, with a place of business located in New York. Knocking engages media partners to build customized turnkey e-commerce platforms, through which its brand partners can market and sell consumer products.

4.     Upon information and belief, defendant Candi Carter is an individual residing in the State of New Jersey. Carter was CCO of Knocking from February 1, 2022 to February 1, 2024. Upon information and belief, Carter is the founder and chief executive officer of defendant Cistus.

5.     Upon information and belief, defendant Cistus Media Inc. is a corporation organized under the laws of the State of Delaware, with a principal place of business in New Jersey. Upon information and belief, like Knocking, Cistus engages media partners to build customized turnkey e-commerce platforms, through which its brand partners can market and sell consumer products.

6.     Upon information and belief, defendant Courtney Spencer is an individual residing in the State of Utah. Spencer was employed by Knocking as a product and lifestyle expert from May 1, 2023 until her resignation on July 18, 2024.

7.      Upon information and belief, defendant Ana Pitcher is an individual residing in Ontario, Canada. Pitcher was employed by Knocking as an independent contractor working in Knocking's production department from approximately October 2018 until she was terminated on November 15, 2024.

## JURISDICTION

8.      This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because the Complaint includes claims arising under the laws of the United States, including the United States Constitution, Article 1, Section 8, the Commerce Clause, and the Defend Trade Secrets Act of 2016, 18 U.S.C. § 1836, *et seq*.

9.      This Court has supplemental jurisdiction under 28 U.S.C. § 1367(a) over the ancillary state law claim, *i.e.*, common law misappropriation of trade secrets (cause of action two), tortious interference with contract (cause of action three), tortious interference with prospective economic relations (cause of action four), aiding and abetting and civil conspiracy related to the misappropriation of trade secrets and tortious interference with prospective economic relations (causes of action five through eight), unjust enrichment (cause of action nine), breach of contract (causes of action ten and thirteenth), breach of duty of loyalty (cause of action eleven), breach of covenant of good faith and fair dealing (cause of action twelve), because they are so related to the claims in which this court has original jurisdiction, *i.e.*, under 18 U.S.C. § 1836, *et seq*., and that the claims should be heard together.

## VENUE

10.      The events giving rise to these causes of action occurred in the Southern District of New York as Defendants utilized Plaintiff's misappropriated proprietary and confidential trade secrets to solicit Plaintiff's media and brand partners in the Southern District of New York, where

a majority of the media partners and several of the brand partners, at dispute herein, operate and/or maintain a principal place of business. As such, venue is proper, pursuant to 28 U.S.C. § 1391(a)(2), because a substantial part of the events or omissions giving rise to the claim occurred in the Southern District of New York.

11.     This Court has personal jurisdiction over the Defendants pursuant to Federal Rule of Civil Procedure - Rules 4(e), (f), and (h) and New York Civil Practice Laws & Rules (hereinafter "CPLR") Section 302(a)(2), because defendants, Carter and Cistus (individually and/or as an alter ego of Carter), committed a tortious act within the State of New York. This Court further has personal jurisdiction over the remaining defendants, *i.e.*, Cistus, Spencer, and Pitcher, pursuant to CPLR § 302(a)(2), as each of the Defendants acted in concert with Carter, for the purposes of misappropriating trade secrets and facilitating the theft of Plaintiff's trade secrets. This Court also has personal jurisdiction over all the Defendants in that they transacted business and/or provided services within the State of New York.

## **FACTUAL BACKGROUND**

Plaintiff Knocking Inc.

12.     Since approximately 2017, Knocking has operated as an e-commerce, media production and marketing company.

13.     At a high level, Knocking develops and maintains fully functioning e-commerce platforms for its media partners, including CBS and other television and radio networks, through which their media partners can then directly sell consumer products, manufactured by Knocking's brand partners.

14.     On the media production and marketing side, Knocking develops and produces tailored segments to showcase and market its brand partners' various consumer products.

15.    This creates a closed ecosystem through which media companies can supplement their revenue, historically limited to advertising, to include retail revenue while brand partners can grow their sales, without directly carrying marketing costs.

16.    Essentially, Knocking creates a market through which all stakeholders can mutually grow and profit.

Plaintiff Knocking's Confidential and Proprietary Information

17.    Since its formation, Knocking has developed an internal system of operation to grow its network and its media and brand relationships.

18.    Typically, Knocking pursues, pitches, negotiates, and onboards brand relationships with tools, materials, scripts and processes that it has tested and refined since its formation in 2017.

19.    More specifically, Knocking's brand team develops relationships with brands that sell consumer products by, among other things, researching market trends, sourcing brands that are trending on social media, traveling to tradeshows and industry meetings, and through referrals from business-to-business partners like Shopify and Knocking's special advisors.

20.    Once a potential partner brand is identified, Knocking expends considerable efforts through networking, cold calls, and targeted emails to identify and connect with individuals with decision-making authority at these various brands.

21.    Through these efforts, Knocking attempts to secure a pitch meeting, wherein Knocking's brand team uses the company's proprietary marketing materials to secure a potential partnership, by providing these potential brand partners with tailored information about the potential growth in sales a partnership with Knocking can provide.

22.    Once a brand partner engages with Knocking, the company's brand team then obtains confidential information from the brands regarding, among other things, their offerings,

costs, product availability, sales price requirements, product margins, industry trends, and historical sales data.

23.     With this information, Knocking's brand and e-commerce teams identify media partners with synergistic marketing opportunities for each brand and its products, which includes seamlessly integrating these products into media spots, and then making these products available on each media partner's customized e-commerce platform, which Knocking creates and maintains.

24.     The confidential and proprietary trade secrets at dispute herein is the information exchanged between Knocking and its brand partners, which include each brand's product information, costs, and the identities and contact information of the decision-makers at each brand – as Knocking expended considerable time, cost, and effort in obtaining this information - and the terms of the relationship between Knocking and its brand partners (*e.g.* Knocking's contractual terms with each brand partner, its profits/revenue per brand/product, and go-to market strategies for each brand).

25.     The confidential and proprietary trade secrets at dispute herein also include Knocking's strategic plans to develop e-commerce platforms for potential media partners, like the BET Network.

26.     Knocking protects this information by maintaining it in secure/password protected databases and software, including, without limitation, Xero GL, ADP, BambooHR, and HubSpot CRM.

27.     Knocking further secures its confidential information by siloing its various teams such that information is only shared on an as-needed basis, through Knocking's secure Google platform, and **requiring its employees to sign binding and enforceable confidentiality provision as a material condition of their employment**.

<u>Knocking's Relationship with Defendant Candi Carter</u>

28.     On or about February 1, 2022, Knocking and defendant, Carter, entered into an employment agreement (the "CC Employment Agreement"), dated as of February 1, 2022.

29.     Pursuant to § 1 of the CC Employment Agreement, the employment period in the agreement was for one (1) year with an annual option to renew.

30.     Pursuant to § 2 of the CC Employment Agreement, Carter was hired as the CCO of Knocking, responsible for all normal and customary responsibilities of a CCO, including, without limitation, the duty to identify and develop relationships with new media partners, as further expanded upon in Exhibit A to the agreement (*i.e.* the revenue share bonus provision).

31.     Pursuant to § 3 of the CC Employment Agreement, Carter was to be paid Six Hundred Thousand Dollars ($600,000.00). During her tenure and in light of her promises regarding her abilities to bring Plaintiff new media partners, Carter was granted the single highest base salary of any Knocking employee.

32.     Notably, Knocking's board of directors refused to grant Carter stock options on top of this generous salary, therefore, in order to gain board approval for the hiring of Carter, Knocking's chief executive officer and chief operating officer surrendered a portion of their personal stock options to Carter, to ensure she would also receive equity.

33.     Pursuant to § 5 of the CC Employment Agreement, Carter agreed to return all "Company Property" in her possession to Knocking within seven (7) days of the termination of the CC Employment Agreement; "Company Property" is defined in § 8 to include, *inter alia*, all Knocking records, documents, promotional materials.

34.     Pursuant to § 7 of the CC Employment Agreement and as a material pre-condition to this agreement, Carter agreed to be bound by and subject to the terms of a non-competition,

proprietary information and inventions agreement (the "CC NCPII"), which was attached and incorporated to the CC Employment Agreement as Exhibit B.

35.     Pursuant to § 2.1 of the CC NCPII, Knockings proprietary information was explicitly defined as "all information, data, and materials relating to the [b]usiness of the [c]ompany, including without limitation: (i) trade secrets, inventions, mask works, ideas, formulas, processes, prototypes, models, source and object codes, data, know-how, improvements, discoveries, designs and techniques developed, created, conceived of or reduced to practice by any employee or contractor of the [c]ompany (including by [e]mployee/[c]ontractor in the course of [e]mployee/[c]ontractor's employment/engagement); (ii) the nature and description of development and business plans for the [c]ompany, including plans for research and future products, budgets, marketing, customer data and information relating to relationships between the [c]ompany and other entities, including licenses and other contracts; (iii) reports and data developed or acquired by the [c]ompany (including any data developed by [e]mployee/[c]ontractor hereunder and documented in tangible form, which items are and shall remain at all times the sole and exclusive property of the [c]ompany); and (iv) forms, policies, handbooks and other forms of written and nonwritten (including intangible) data, experience and information, whether of a technical, operational or economic nature relating to the business, services and employees of the [c]ompany. '**Proprietary Information**' includes the Proprietary Information of third parties that the [c]ompany is required to keep confidential." (*emphasis in original*).

36.     Pursuant to § 2.2 of the CC NCPII, Carter acknowledged and agreed, *inter alia*, that she would not use for any purpose, other than the furtherance of the business of Knocking, or disclose to any person, any proprietary information of the company and she further agreed to

surrender all Knocking's proprietary information to Knocking upon the termination of the CC Employment Agreement.

37.    Pursuant to § 8 of the CC NCPII, Carter acknowledged and agreed that her breach of the agreement may cause irreparable injury to Knocking "for which the [c]ompany will not have an adequate remedy at law, and that the [c]ompany shall therefore be entitled to apply to a court for extraordinary relief, including but not limited to temporary restraining orders, preliminary injunctions, permanent injunctions or decrees of specific performance, without necessity of posting bond or security."

38.    Pursuant to the terms of the CC Employment Agreement and the CC NCPII, Carter served as the CCO of Knocking from February 1, 2022 to March 10, 2023.

39.    On or about March 10, 2023, Knocking and Carter entered into an amended and restated employment agreement (the "Second CC Employment Agreement"), as of March 10, 2023, which extended Carter's employment as CCO to February 1, 2024. The CC Employment Agreement, CC NCPII, and Second CC Employment Agreement are together herein referred to as the "CC Agreements."

40.    Each of the above-referenced terms of the CC Employment Agreement were explicitly adopted in the Second CC Employment Agreement.

41.    On January 5, 2024, Knocking's chief executive officer informed Carter that Knocking would not be extending her employment agreement for an additional term, meaning that her employment would expire on February 1, 2024.

42.    Carter raised various objections to the expiration of her employment agreement.

43.    Although Knocking disputed the validity of Carter's objections, in a good faith effort to separate amicably, Knocking negotiated a severance agreement with Carter which

culminated in the parties entering into a confidential settlement agreement and general release (the "Settlement Agreement"), dated as of September 20, 2024.

44.    Through the Settlement Agreement, Knocking agreed to release Carter from her restrictive covenants/non-competes but explicitly retained all rights to its proprietary information as defined in the CC NCPII.

45.    Unbeknownst to Knocking, while it was negotiating with Carter in good faith, Carter was surreptitiously misappropriating Knocking's proprietary information by stealing the same through co-defendants Spencer and Pitcher, who remained employees of Knocking, while continuously providing Carter with Knocking's confidential information related to its brand partners.

Knocking Pursues BET as a Media Partner

46.    As outlined above, during her tenure, part of Carter's responsibilities as CCO was to develop relationships and partnerships with media outlets.

47.    To that end, on November 14, 2023, Carter and defendant Pitcher instructed another Knocking employee to design a pitch deck for a potential partnership between Knocking and the BET Network ("BET"), which included an e-commerce strategy, implementation strategies, marketing options, design ideas, and, most importantly, potential partnerships with specific Knocking brand partners.

48.    On November 30, 2024, the Knocking employee finalized the BET pitch deck and emailed the same to Carter and Pitcher.

49.    This deck outlined the strategy Knocking intended to use in acquiring BET's business and fell within the purview of Knocking's proprietary information, as defined in the CC Agreements.

50.     On January 5, 2024, Knocking's chief executive officer informed Carter that Knocking would not be further extending the CC Agreements.

<u>Defendants' Misappropriation of Knocking's Proprietary and Confidential Trade Secrets</u>

51.     Upon information and belief, on February 26, 2024, while Carter was still bound by the non-compete and non-solicitation provisions of the CC Agreements and while Knocking was negotiating a separation between the parties, in good faith, Carter incorporated defendant Cistus in the State of Delaware.

52.     Defendant Courtney Spencer had a relationship with Carter prior to joining Knocking and was hired on Carter's recommendation as a member of Knocking's brand team.

53.     Following Carter's exit, Spencer continued to work for Knocking until July 18, 2024, when she resigned.

54.     From her hiring in 2023 to her resignation on July 18, 2024, Spencer had access to proprietary information related to Knocking's brand partners through her role as a member of the brand team.

55.     Defendant Pitcher worked for Knocking and reported directly to Carter for approximately one (1) year before Carter's exit.

56.     Pitcher was intimately familiar with and had access to (1) the mechanism by which Knocking creates customized e-commerce stores for its media partners; (2) Knocking's proprietary business development plans and strategies, having worked directly with Carter on conversations with potential media clients, including BET in late 2023; and, (3) Knocking's database and brand partner files, including, without limitation, brand partner contact, products, and pricing information, having frequently collaborating with Spencer.

57.     Upon information and belief, from at least February 1, 2024 and until each of their resignations or terminations, Spencer and Pitcher surreptitiously misappropriated Knocking's confidential and proprietary trade secrets, which included, without limitation, Knocking's brand and media partners' confidential personal and financial information, strategic plans, and development strategies, and transferred the same to defendants Carter and Cistus.

58.     For example, on September 3, 2024, while she was still bound by Plaintiff's restrictive covenants, Spencer received, through her old Knocking email account, what appears to be a draft email with language to be sent to solicit business from a potential brand partner, likely leveraging Knocking's proprietary information about brands (*e.g.* contact info, products, sales levels), in order to secure a new brand/media relationship for Cistus.

59.     Similarly, Pitcher, as a foreign national, working in the United States through a TN-1 visa, sponsored by Knocking, regularly traveled to New York, at Knocking's expense, for the stated purpose of working to develop Knocking's business while, in truth, supporting Carter and Cistus' business development and video production activities.

60.     For example, on February 6, 2024, Knocking flew Pitcher to New York to represent Knocking at the "NY Now" trade show.

61.     Rather than accompanying the Knocking team, upon information and belief, Pitcher accompanied Carter to a business meeting with a U.S. manufacturing company, in early preparation for the launch of Cistus, and in violation of the terms of Pitcher's employment agreement and TN-1 visa.

62.     Notably, from October 29, 2024 to November 13, 2024 (*i.e.* the launch of the Cistus/BET e-commerce web shop), Pitcher was uncharacteristically unavailable to work for Knocking.

63. Traditionally, the holiday shopping period from October to December is an all-hands-on-deck period for all Knocking employees.

64. Yet, Pitcher informed her supervisor that she had limited availability from October 29, 2024 to October 31, 2024, then took five (5) days of vacation from November 4, 2024 through November 8, 2024, and, finally, called in sick on November 11, 2024, clearly timed for the week of the Cistus-BET webstore launch.

65. On November 13, 2024, Carter emailed Pitcher, from Carter's Cistus email account to Pitcher's Knocking email account, what appears to be a confidential simple agreement for future equity, by and between Cistus, Valerie Mosley of Valmo Ventures, and Inspira Financial Trust, LLC, with a note that Cistus had received Forty Thousand Dollars ($40,000.00) in financing.

66. Neither of the individual Defendants disclosed their working relationship with Carter and Cistus to Knocking at any time. To be clear, Pitcher was an employee of Knocking until November 15, 2024, when she was terminated.

67. On October 1, 2024, Carter publicly announced the launch of Cistus.

68. On November 13, 2024, Cistus announced its partnership with BET, the same media partner that she used Knocking's resources to develop a pitch and marketing strategy for, as described *supra*.

69. Upon review of the Cistus-BET webstore, Knocking discovered numerous brands that were poached from Knocking, as well as elements of the website that seemed to match Knocking's original designs for an eventual BET store.

70. The Cistus-BET webstore included products for sale from Knocking's brand partners Halt, A-Frame Brands, Shapermint, BeautyStat, Blinger, and Elite.

71.    On November 13, 2024, A-Frame Brands – a consumer goods brand company that has a long-standing relationship with Knocking – informed Knocking that Spencer contacted A-Frame Brands, using brand and contact information Spencer had obtained while working at Knocking, to solicit A-Frame Brands to enter into a business relationship with Cistus, while offering to undercut Knocking's margins, based upon proprietary trade secrets directly misappropriated from Knocking.

72.    Knocking has received similar notice from other brand partners, including Elite.

73.    It is clear that Defendants have and continue to tortiously compete with Knocking, in violation of their various contractual duties to Knocking.

74.    Therefore, Plaintiff now respectfully seeks injunctive relief from the Court and compensatory and pecuniary damages as outlined below.

**FIRST CAUSE OF ACTION**
*Violation of the Defend Trade Secret Act, 18 U.S.C. § 1836, et seq.*
(against all Defendants)

75.    Plaintiff repeats, repleads, and realleges each and every allegation contained in the foregoing Paragraphs, as if fully stated herein.

76.    Plaintiff's confidential and proprietary trade secrets, as defined and agreed upon between the parties in their respective employment agreements, includes "all information, data, and materials relating to the [b]usiness of the [c]ompany, including without limitation: (i) trade secrets, inventions, mask works, ideas, formulas, processes, prototypes, models, source and object codes, data, know-how, improvements, discoveries, designs and techniques developed, created, conceived of or reduced to practice by any employee or contractor of the [c]ompany (including by [e]mployee/[c]ontractor in the course of [e]mployee/[c]ontractor's employment/engagement); (ii) the nature and description of development and business plans for the [c]ompany, including plans

for research and future products, budgets, marketing, customer data and information relating to relationships between the [c]ompany and other entities, including licenses and other contracts; (iii) reports and data developed or acquired by the [c]ompany (including any data developed by [e]mployee/[c]ontractor hereunder and documented in tangible form, which items are and shall remain at all times the sole and exclusive property of the [c]ompany); and (iv) forms, policies, handbooks and other forms of written and nonwritten (including intangible) data, experience and information, whether of a technical, operational or economic nature relating to the business, services and employees of the [c]ompany. '**Proprietary Information**' includes the Proprietary Information of third parties that the [c]ompany is required to keep confidential." (*emphasis in original*).

77.     More specifically, the confidential and proprietary trade secrets at dispute herein is the information exchanged between Knocking and its brand partners, which include each brand's product information, costs, and the identities and contact information of the decision-makers at each brand – as Knocking expended considerable time, cost, and effort in obtaining this information - and the terms of the relationship between Knocking and its brand partners (*e.g.* Knocking's contractual terms with each brand partner, its profits/revenue per brand/product, and go-to market strategies for each brand).

78.     The confidential and proprietary trade secrets at dispute herein also include Knocking's strategic plans to develop e-commerce platforms for potential media partners, like the BET Network. The confidential and proprietary information defined in ¶¶ 76 and 77 are hereinafter defined as "Trade Secrets"

79.     These Trade Secrets have independent economic value as they represent a significant amount of Knocking's goodwill, prior investment into market research and business development.

80.     Knocking has taken reasonable steps to secure these Trade Secrets, by, among other things, maintaining this information in secure/password protected databases and software, including, without limitation, Xero GL, ADP, BambooHR, and HubSpot CRM.

81.     Knocking further secures its Trade Secrets by siloing its various teams such that information is only shared on an as-needed basis, through Knocking's secure Google platform, and requiring its employees to sign binding and enforceable confidentiality provision as a necessary precondition of their employment.

82.     Defendants misappropriated these Trade Secrets pursuant to 18 U.S.C. § 1836, *et seq.* and used the same in interstate commerce in order to solicit Plaintiff's media and brand partners.

83.     Defendants knowingly obtained, transferred, and retained these Trade Secrets by improper means.

84.     Defendants used these Trade Secrets for their personal benefit, in order to solicit Plaintiff's media and brand partners, at Plaintiff's expense.

85.     Defendants' misappropriation was willful and malicious.

86.     The duties owed to Plaintiff with respect to its Trade Secrets arising under 18 U.S.C. § 1836 are separate and apart from those duties that arise from contract in that the statute provides additional protections, not included in the contracts, which provides protections for goods or services that enter interstate commerce and also a mechanism for the seizure of such trade secrets and recoupment of royalties.

87.     Defendants' misappropriation of the Trade Secrets has directly and proximately caused injury to Plaintiff, which is immediate and irreparable, and for which Plaintiff is entitled to equitable relief and damages.

88.     Accordingly, Plaintiff seeks a permanent injunction against all Defendants, damages, in an amount to be proven at trial but not less than One Million Eight Hundred Thousand Dollars ($1,800,000.00), and all such other remedies, in equity or at law, permitted under 18 U.S.C. § 1836(b).

## SECOND CAUSE OF ACTION
*Common Law Misappropriation of Trade Secrets*
(against all Defendants)

89.     Plaintiff repeats, repleads, and realleges each and every allegation contained in the foregoing Paragraphs, as if fully stated herein.

90.     Defendants misappropriated the Trade Secrets under New York common law.

91.     The Trade Secrets have independent economic value that Plaintiff has taken reasonable measures to keep secret.

92.     Defendants knew that the Trade Secrets were acquired by improper means.

93.     Defendants knowingly obtained, transferred, and retained these Trade Secrets by improper means.

94.     Defendants used these Trade Secrets for their personal benefit, in order to solicit Plaintiff's media and brand partners, at Plaintiff's expense.

95.     Defendants' misappropriation was willful and malicious.

96.     Defendants' misappropriation of the Trade Secrets has directly and proximately caused injury to Plaintiff, which is immediate and irreparable.

97.     Accordingly, Plaintiff seeks a permanent injunction against all Defendants, damages, in an amount to be proven at trial but not less than One Million Eight Hundred Thousand Dollars ($1,800,000.00), and all such other remedies, in equity, permitted under New York law.

### THIRD CAUSE OF ACTION
*Tortious Interference with Contract*
(against Defendant Candi Carter)

98.     Plaintiff repeats, repleads, and realleges each and every allegation contained in the foregoing Paragraphs, as if fully stated herein.

99.     On May 9, 2023, Knocking and defendant, Spencer, entered into a written employment agreement (the "CS Employment Agreement"), dated as of May 1, 2023.

100.    Pursuant to § 8 of the CS Employment Agreement and as a material pre-condition to this agreement, Spencer agreed to be bound by and subject to the terms of a non-competition, proprietary information and inventions agreement (the "CS NCPII"), which was attached and incorporated to the CS Employment Agreement as Exhibit A. The CS Employment Agreement and CS NCPII Agreement are hereinafter referred to as the "CS Agreements".

101.    Pursuant to § 2 of the CS Employment Agreement, Spencer agreed to serve as a member of Knocking's branding team on an exclusive basis.

102.    Pursuant to § 2 of the CS NCPII, Spencer agreed not to use Knocking's Trade Secrets for any purpose other than the furtherance of Knocking's business.

103.    Pursuant to § 6.1 of the CS NCPII, Spencer agreed not to directly or indirectly, seek, solicit, enter into or engage in any employment, business, enterprise, agreement or arrangement with any other person or entity, that is at the time engaged in, or that has clear plans

for future engagement in, competition with Knocking for a twelve (12) month period following the termination of her relationship with Knocking.

104.    Pursuant to § 6.2 of the CS NCPII, Spencer agreed not to (a) solicit or otherwise encourage any employees or contractors of the Knocking to terminate their employment or contractual relationship or other business dealings with the Knocking; (b) employ or engage as an employee or contractor, or cause to be employed or engaged as an employee or contractor, or for or on behalf of Employee or any third party, directly or indirectly, any individual who is an employee or contractor of Knocking for a twelve (12) month period following the termination of her relationship with Knocking.

105.    In October 2018, Knocking and defendant, Pitcher, entered into a consulting services agreement (the "AP Consulting Agreement").

106.    Pursuant to § 5 of the AP Consulting Agreement, Pitcher agreed that "during the term of [the AP Consulting Agreement]  and for a period of three (3) months after termination or expiration hereof (the 'Restricted Period'), [Pitcher] shall not, a) directly or indirectly, seek, solicit, enter into or engage in any employment, business, enterprise, agreement or consulting arrangement with any other person or entity that is at the time engaged in, or that has clear plans for future engagement in, competition with the [Knocking], or b) offer employment to or engage or hire as a contractor or employee any person that is during the term of [the AP Consulting Agreement] employed by or engaged as a contractor or employee by [Knocking]."

107.    Appendix B to the AP Consulting Agreement at § 1 further requires that Pitcher maintain the confidentiality of Knocking's Trade Secrets and prohibits Pitcher from disclosing the same to any third party.

108.    The CS Agreements and AP Consulting Agreement are hereinafter referred to as the "Employment Agreements."

109.    The Employment Agreements are valid, enforceable, and binding.

110.    Defendant Carter was an executive of Knocking, serving as CCO of Knocking from February 1, 2022 to February 1, 2024.

111.    In that role, she was not only aware of the Employment Agreements, but directly hired employees, including Spencer, pursuant to their terms.

112.    Carter intentionally and improperly procured Spencer and Pitcher's respective breaches of the terms, identified above, of the Employment Agreements, without justification.

113.    Knocking incurred and continues to incur damages, including, without limitation, loss of pecuniary benefits and goodwill as a direct and proximate cause of Carter's tortious interference.

114.    Accordingly, Knocking seeks a judgment against defendant Carter, in an amount to be determined by the trier of fact but not less than One Million Eight Hundred Thousand Dollars ($1,800,000.00).

## FOURTH CAUSE OF ACTION
*Tortious Interference with Prospective Economic Relations*
(Against all Defendants)

115.    Plaintiff repeats, repleads, and realleges each and every allegation contained in the foregoing Paragraphs, as if fully stated herein.

116.    Each of the individual Defendants were executives, employees, or contractors of plaintiff Knocking.

117.    In their respective roles, each individual Defendant obtained Knocking's Trade Secrets.

118.    Defendants used such Trade Secrets in order to target Plaintiff's prospective relations with media partners like BET.

119.    In fact, upon information and belief, Defendants used the promotional materials and strategies developed by other Knocking employees, at Knocking's sole cost and expense, to solicit directly solicit BET to engage in a partnership with Cistus, to Knocking's detriment.

120.    Similarly, Defendants used such Trade Secrets to target Plaintiff's future business with its existing brand partners, like Halt, A-Frame Brands, Shapermint, BeautyStat, Blinger, and Elite and redirecting their business towards Cistus' media partner BET, using of these Brand's confidential information and confidential information related to Knocking's existing pricing strategies to undercut Knocking.

121.    Defendants' use of Knocking's Trade Secrets interfered Knocking's business relationships.

122.    Defendants acted with the sole purpose of harming Knocking by using unlawful or wrongful means, *i.e.*, by misappropriating Knocking's Trade Secrets and using the same to undercut it.

123.    Upon information and belief, Defendants continue to solicit business from Plaintiff's other brand partners through the same means.

124.    Knocking incurred and continues to incur damages, including, without limitation, loss of pecuniary benefits and goodwill as a direct and proximate cause of Defendants' tortious interference.

125.    Accordingly, Knocking seeks a judgment against all Defendants in an amount to be determined by the trier of fact but not less than One Million Eight Hundred Thousand Dollars ($1,800,000.00),.

**FIFTH CAUSE OF ACTION**

*Aiding and Abetting – Common Law Misappropriation of Trade Secrets*
(against all Defendants except Carter (the tortfeasor))

126.    Plaintiff repeats, repleads, and realleges each and every allegation contained in the foregoing Paragraphs, as if fully stated herein.

127.    As alleged in ¶¶ 89 to 97, an underlying misappropriation of trade secrets was perpetrated by Carter acting in concert with the other defendants, *i.e.*, Cistus (individually or as an alter ego of Carter), Spencer and Pitcher (the "Aiding and Abetting Defendants").

128.    The Aiding and Abetting Defendants had actual knowledge of the misappropriation of trade secrets perpetrated by Carter. They were all active participants by both acting essentially as moles within Knocking's business and providing information to Carter and/or her alter ego - Cistus.

129.    The Aiding and Abetting Defendants, not only substantially assisted Carter by misappropriating trade secrets but they eventually left Knocking and joined Carter and/or her alter ego – Cistus and used their intimate knowledge of Knocking's inner workings and trade secrets to undercut Knocking.

130.    The Aiding and Abetting Defendants aided and abetted Carter causing Plaintiff injury, which is immediate and irreparable.

131.    Accordingly, Plaintiff seeks a permanent injunction against all Defendants except Carter, damages, in an amount to be proven at trial but not less than One Million Eight Hundred Thousand Dollars ($1,800,000.00), and all such other remedies, in equity, permitted under New York law.

**SIXTH CAUSE OF ACTION**

*Aiding and Abetting – Tortious Interference with Prospective Economic Interest*
(against all Defendants except Carter (the tortfeasor))

132.    Plaintiff repeats, repleads, and realleges each and every allegation contained in the foregoing Paragraphs, as if fully stated herein.

133.    As alleged in ¶¶ 115 to 125, Carter and/or her alter ego tortiously interfered with Knocking's prospective economic interest acting in concert with the Aiding and Abetting Defendants.

134.    The Aiding and Abetting Defendants had actual knowledge of the tortious interference of business perpetrated by Carter. They were all active participants by both acting essentially as moles within Knocking's business and providing information to Carter and/or her alter ego - Cistus.

135.    The Aiding and Abetting Defendants, not only substantially assisted Carter by tortiously interring but they eventually left Knocking and joined Carter and/or her alter ego – Cistus and used their intimate knowledge of Knocking's inner workings and pouched and is continuing to pouch their brands.

136.    The Aiding and Abetting Defendants aided and abetted Carter causing Plaintiff damages including, without limitation, loss of pecuniary benefits and goodwill as a direct and proximate cause of Defendants' tortious interference.

137.    Accordingly, Knocking seeks a judgment against all Defendants except Carter in an amount to be determined by the trier of fact but not less than One Million Eight Hundred Thousand Dollars ($1,800,000.00).

**SEVENTH CAUSE OF ACTION**
*Civil Conspiracy - Misappropriation of Trade Secrets*
(against all Defendants except Carter (the tortfeasor))

138.    Plaintiff repeats, repleads, and realleges each and every allegation contained in the foregoing Paragraphs, as if fully stated herein.

139.    As alleged in Paragraphs ¶¶ 89 to 97, an underlying misappropriation of trade secrets was perpetrated by Carter acting in concert and/or co-conspiring with the Aiding and Abetting Defendants.

140.    The Aiding and Abetting Defendants are vicariously liable to Knocking for each other's offenses.

141.    The Aiding and Abetting Defendants aided and abetted Carter causing Plaintiff injury, which is immediate and irreparable.

142.    Accordingly, Plaintiff seeks a permanent injunction against all Defendants except Carter, damages, in an amount to be proven at trial but not less than One Million Eight Hundred Thousand Dollars ($1,800,000.00), and all such other remedies, in equity, permitted under New York law.

## EIGHTH CAUSE OF ACTION
*Civil Conspiracy - Tortious Interference with Prospective Economic Interest*
(against all Defendants except Carter (the tortfeasor))

143.    Plaintiff repeats, repleads, and realleges each and every allegation contained in the foregoing Paragraphs, as if fully stated herein.

144.    As alleged in paragraphs ¶¶ 115 to 125, Carter and/or her alter ego tortiously interfered with Knocking's prospective economic interest acting in concert with the Aiding and Abetting Defendants.

145.    The Aiding and Abetting Defendants are vicariously liable to Knocking for each other's offenses.

146.    The Aiding and Abetting Defendants aided and abetted Carter causing Plaintiff damages including, without limitation, loss of pecuniary benefits and goodwill as a direct and proximate cause of Defendants' tortious interference.

147.    Accordingly, Knocking seeks a judgment against all Defendants except Carter in an amount to be determined by the trier of fact but not less than One Million Eight Hundred Thousand Dollars ($1,800,000.00).

### NINTH CAUSE OF ACTION
*Unjust Enrichment*
(against Defendant Cistus Media Inc.)

148.    Plaintiff repeats, repleads, and realleges each and every allegation contained in the foregoing Paragraphs, as if fully stated herein.

149.    Defendant Cistus has benefited from the use of Plaintiff's Trade Secrets, which include confidential media and brand information and used such information to solicit Plaintiff's media and brand partners.

150.    Cistus acquired these Trade Secrets through improper means at Plaintiff's expense.

151.    Equity and good conscience require that Cistus return Plaintiff's Trade Secrets and any benefits acquired from their use.

152.    Accordingly, Knocking seeks a judgment against defendant, Cistus, in an amount to be determined by the trier of fact but not less than One Million Eight Hundred Thousand Dollars ($1,800,000.00).

### TENTH CAUSE OF ACTION
*Breach of Contract*
(against Defendants Candi Carter, Courtney Spencer, and Ana Pitcher)

153.    Plaintiff repeats, repleads, and realleges each and every allegation contained in the foregoing Paragraphs, as if fully stated herein.

154.    Defendant Carter entered into the CC Agreements with Plaintiff as defined above.

155.    The CC Agreements are valid, binding, and enforceable.

156.    The CC Agreements required that Carter return or destroy Plaintiff's Trade Secrets.

157.    Carter breached the confidentiality provisions of the Employment Agreements by disclosing confidential information and Knocking Trade Secrets to third parties, including Cistus, after the termination of the CC Agreements.

158.    Knocking has complied with each and every term of the CC Agreements.

159.    Defendants Spencer and Pitcher each entered into Employment Agreements with Plaintiff as defined above.

160.    The Employment Agreements are valid, binding, and enforceable.

161.    Each Employment Agreements included restrictive covenants precluding Spencer and Pitcher from competing against Plaintiff for between three (3) and twelve (12) months.

162.    Each Employment Agreement requires that Spencer and Pitcher return or destroy Plaintiff's Trade Secrets.

163.    Defendants Spencer and Pitcher breached the restrictive covenants of the Employment Agreements by working for Cistus, a competing business, before and during the restricted period of their Employment Agreements.

164.    Defendants Spencer and Pitcher breached the confidentiality provisions of the Employment Agreements by disclosing confidential information and Knocking Trade Secrets to third parties, including Carter and Cistus, during and after the termination of such each Employment Agreement.

165.    Knocking has complied with each and every term of the Employment Agreements.

166.    The duties owed to Plaintiff with respect to its Trade Secrets arising under its contracts are separate and apart from those duties that arise from the statute in that the contract covers goods and services provided intrastate.

167.    Knocking incurred and continues to incur damages, including, without limitation, loss of pecuniary benefits and goodwill as a direct and proximate cause of defendants Carter, Spencer and Pitcher various breaches of their employment agreements.

168.    Accordingly, Knocking seeks a judgment against defendants Carter, Spencer, and Pitcher in an amount to be determined by the trier of fact but not less than One Million Eight Hundred Thousand Dollars ($1,800,000.00).

## ELEVENTH CAUSE OF ACTION
*Breach of the Duty of Loyalty*
(against Defendants Courtney Spencer and Ana Pitcher)

169.    Plaintiff repeats, repleads, and realleges each and every allegation contained in the foregoing Paragraphs, as if fully stated herein.

170.    By virtue of their employment with Knocking, defendants Spencer and Pitcher had a duty of loyalty to Knocking to maintain its Trade Secrets in utmost confidence.

171.    By virtue of their employment with Knocking, defendants Spencer and Pitcher had a duty of loyalty to Knocking precluding them from working for and/or assisting defendant Cistus Media, Inc., a newly formed direct competitor of Knocking.

172.    Defendants Spencer and Pitcher breached their duty of loyalty by directly transferring Knocking's Trade Secrets to Cistus, while employed by Knocking.

173.    Defendants further breached their duty of loyalty by soliciting Knocking's media and brand partners on behalf of Cistus, while employed by Knocking.

174.    Knocking incurred and continues to incur damages, including, without limitation, loss of pecuniary benefits and goodwill as a direct and proximate cause of defendants Spencer, and Pitcher various breaches of their duty of loyalty to Knocking.

175.    Accordingly, Knocking seeks a judgment against defendants Spencer and Pitcher in an amount to be determined by the trier of fact but not less than One Million Eight Hundred Thousand Dollars ($1,800,000.00).

## TWELFTH CAUSE OF ACTION
*Breach of the Covenant of Good Faith and Fair Dealing*
(against Defendants Candi Carter, Courtney Spencer and Ana Pitcher)

176.    Plaintiff repeats, repleads, and realleges each and every allegation contained in the foregoing Paragraphs, as if fully stated herein.

177.    Under New York law and Connecticut law, all contracts imply the covenant of good faith and fair dealing in the performance of a contract

178.    As alleged in Paragraphs ¶¶ 153 to 168, the individual defendants Carter, Spencer, and Pitcher (collectively the "Individual Defendants") breached the confidentiality provisions of the Employment Agreements by disclosing confidential information and Knocking Trade Secrets to third parties, during and after the termination of such each Employment Agreement.

179.    As a result of such breach, Knocking incurred and continues to incur damages, including, without limitation, loss of pecuniary benefits and goodwill as a direct and proximate cause of defendants Carter, Spencer and Pitcher various breaches of their employment agreements.

180.    Accordingly, Knocking seeks a judgment against defendants Carter, Spencer, and Pitcher in an amount to be determined by the trier of fact but not less than One Million Eight Hundred Thousand Dollars ($1,800,000.00).

## THIRTEENTH CAUSE OF ACTION
*Breach of Contract – Award of Attorneys' Fees*
(against Defendants Candi Carter, Courtney Spencer, and Ana Pitcher)

181.    Plaintiff repeats, repleads, and realleges each and every allegation contained in the foregoing Paragraphs, as if fully stated herein.

182.    As alleged in Paragraphs ¶¶ 153 to 168, the Individual Defendants breached the confidentiality provisions of the Employment Agreements by disclosing confidential information and Knocking Trade Secrets to third parties, during and after the termination of such each Employment Agreement.

183.    As a result of these breaches, Plaintiff is entitled to an award of attorneys' fees.

184.    Accordingly, Knocking seeks a judgment against defendants Carter, Spencer, and Pitcher in an amount to be determined by the trier of fact but not less than One Million Eight Hundred Thousand Dollars ($1,800,000.00).

## JURY DEMAND

Plaintiff respectfully demands a jury trial of all issues.

## PRAYER FOR RELIEF

**WHEREFORE,** in consideration of the foregoing, Plaintiff respectfully prays for the following relief:

(A) on the First Cause of Action against all defendants, *i.e.*, Candi Carter, Cistus Media Inc., Courtney Spencer, and Ana Pitcher, a permanent injunction damages, damaged, in an amount to be proven at trial but not less than One Million Eight Hundred Thousand Dollars ($1,800,000.00), and all such other remedies, in equity or at law, permitted under 18 U.S.C. § 1836(b);

(B) on the Second Cause of Action against all Defendants, a permanent injunction damages, damaged, in an amount to be proven at trial but not less than One Million Eight Hundred Thousand Dollars ($1,800,000.00), and all such other remedies, in equity or at law, permitted under New York law;

(C) on the Third Cause of Action against defendant, Carter, a judgment in an amount to be determined by the trier of fact, than One Million Eight Hundred Thousand Dollars ($1,800,000.00), and all such other remedies, in equity or at law, permitted under New York law;

(D) on the Fourth Cause of Action against all Defendants, a judgment in an amount to be determined by the trier of fact, than One Million Eight Hundred Thousand Dollars ($1,800,000.00), and all such other remedies, in equity or at law, permitted under New York law;

(E) on the Fifth and Seventh Causes of Action against all Defendants except Carter (the tortfeasor), a permanent injunction damages, damaged, in an amount to be proven at trial but not less than One Million Eight Hundred Thousand Dollars ($1,800,000.00), and all such other remedies, in equity or at law, permitted under New York law;

(F) on the Sixth and Eighth Causes of Action against all Defendants except Carter (the tortfeasor), a judgment in an amount to be proven at trial but not less than One Million Eight Hundred Thousand Dollars ($1,800,000.00), and all such other remedies, in equity or at law, permitted under New York law;

(G) on the Ninth Cause of Action against Cistus, a judgment against defendant, Cistus, in an amount to be determined by the trier of fact but not less than One Million Eight Hundred Thousand Dollars ($1,800,000.00), and all such other remedies, in equity or at law, permitted under New York law;

(H) on the Tenth, Twelfth and Thirteenth Causes of Action against defendants Carter, Spencer, and Pitcher, a judgment in an amount to be determined by the trier of fact but not less than One Million Eight Hundred Thousand Dollars ($1,800,000.00), and all such other remedies, in equity or at law, permitted under New York or Connecticut law;

(I) on the Eleventh Cause of Action against defendants Spencer and Pitcher, a judgment in an amount to be determined by the trier of fact but not less than One Million Eight Hundred Thousand Dollars ($1,800,000.00), and all such other remedies, in equity or at law, permitted under New York law; and,

(J) for the First through the Thirteenth Causes of Action, pre and post judgment interest, costs, disbursements, attorneys' fees and such other relief as this Court deems just and proper.

Dated: New York, New York
         November 25, 2024

                                        Respectfully submitted,


                                        Thomas H. Herndon, Jr., Law PLLC
                                        and of Counsel to Weinstein + Klein P.C.

                                        /s/ Thomas H. Herndon, Jr.
                                        _____
                                        Thomas H. Herndon, Jr., Esq.
                                        *Attorneys for Plaintiff*
                                        *Knocking Inc.*
                                        34 Crest Drive
                                        South Orange, New Jersey 07079
                                        Telephone No.: (646) 699-8814
                                        Email: therndon@thhjrlaw.com
                                        therndon@weinsteinklein.com



                                        Weinstein + Klein P.C.

                                        /s/ Brian Klein
                                        _____
                                        Brian Klein, Esq.
                                        *Attorneys for Plaintiff*
                                        *Knocking Inc.*
                                        500 7th Avenue, 8th Floor
                                        New York, New York 10018
                                        Telephone No.: (347) 502-6461
                                        Email: bklein@weinsteinklein.com