USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_________________
DATE FILED: 9/30/2026

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------X
KNOCKING INC.,

Plaintiff,

-against-

CANDI CARTER, CISTUS MEDIA INC., and ANA PITCHER,

Defendants.
-----------------------------------------------------------X

24-CV-9020 (VEC)

OPINION AND ORDER

VALERIE CAPRONI, United States District Judge:

On November 25, 2024, Knocking Inc. ("Knocking" or "Plaintiff") sued Candi Carter, Ana Pitcher, Courtney Spencer,[1] and Cistus Media Inc. ("Cistus," and together with Carter and Pitcher, "Defendants"), alleging violations of the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836, *et seq.*, breach of contract, and various torts, all related to Defendants' purportedly improper exfiltration and use of Knocking's confidential, trade secret information to establish a competing business venture. *See generally* Compl., Dkt. 1. Plaintiff amended its complaint on September 2, 2025. *See* FAC, Dkt. 105. Defendants moved to dismiss the First Amended Complaint on September 19, 2025. *See* Dkt. 111. The motion to dismiss was fully submitted on October 10, 2025, *see* Dkt. 126, and remains pending.

[1] On June 23, 2026, the Court entered an order of judgment in favor of Plaintiff and against Spencer in the amount of $64,652.00, resolving all claims against Spencer and terminating her as a party to this action. *See* Dkt. 248.

Fact discovery concluded on December 5, 2025.[2] *See* Dkts. 133, 153. On February 26, 2026, Defendants moved for summary judgment on all claims. *See* Dkt. 169. Plaintiff opposed Defendants' motion on April 10, 2026. *See* Dkts. 200 (sealed), 209 (public). At the same time, Plaintiff cross-moved for spoliation sanctions against Pitcher premised on the theory that she wrongfully destroyed her laptop during the pendency of this litigation, thus destroying potential evidence. *See* Dkts. 200 (sealed), 209 (public). The summary judgment motion was fully submitted on May 1, 2026, alongside Defendants' opposition to Plaintiff's cross-motion for spoliation sanctions. *See* Dkts. 211 (sealed), 222 (public). Plaintiff replied in support of its cross-motion on May 8, 2026. *See* Dkt. 217.

For the following reasons, Defendants' motion for summary judgment is GRANTED, and Plaintiff's cross-motion for spoliation sanctions is DENIED. Because the Court's grant of summary judgment fully resolves this action, it will not separately consider Defendants' outstanding motion to dismiss the First Amended Complaint. Accordingly, the motion to dismiss is summarily DENIED as moot.

## BACKGROUND[3]

Knocking is a tech startup founded in 2014 (as "Kwingle Inc.," a software development company). SOMF ¶ 155. In 2017, the company took on its current moniker and "pivot[ed] to its

[2] The lone fact discovery hanging chad after that date involved Court-ordered "efforts to locate Pitcher's former laptop." *See* Dkt. 153 at 2. Those activities continued into early 2026, *see id.*, and are discussed more fully below.

[3] These material facts are gathered from the parties' consolidated Rule 56.1 statement, Dkts. 212 (sealed), 223 (public) ("SOMF"), the exhibits to the parties' submissions, and the parties' summary judgment briefs. The facts are construed in the light most favorable to the non-moving party. *See Wandering Dago, Inc. v. Destito*, 879 F.3d 20, 30 (2d Cir. 2018). All facts are undisputed unless otherwise indicated. The Court will refer to the relevant submissions as follows: Defendants' memorandum of law in support of its motion, Dkts. 170 (sealed), 189 (public, as "Def. Br."; Plaintiff's memorandum in opposition to Defendants' motion and Plaintiff's cross-motion for spoliation sanctions, Dkts. 200 (sealed), 209 (public), as "Pl. Opp. & Spol. Mot."; Defendants' reply memorandum and opposition to Plaintiff's cross-motion for spoliation sanctions, Dkts. 211 (sealed), 222 (public), as "Def. Reply & Spol. Opp."; and Plaintiff's reply in support of its cross-motion for spoliation sanctions, Dkt. 217, as "Pl. Spol. Reply." Citations to numerical exhibits (*e.g.*, "Ex. 1") refer to Defendants' exhibits appended to the Declarations of

present media and ecommerce business model." *Id.* Knocking is, for all intents and purposes, a media-marketing middleman. It partners with media networks (like television and radio organizations) to develop and maintain "fully functioning e-commerce platforms" for those affiliates. *Id.* ¶ 157. Knocking has a stable of "brand partners" with which it "develops and produces tailored segments to showcase and market [the] brand partners' various consumer products." *Id.* ¶ 158. These products are then featured and sold on the e-commerce platforms that Knocking develops and operates for its media partners. *Id.* ¶ 157.[4]

Defendant Carter is a decades-long veteran of the media industry. *Id.* ¶ 1. Her experience includes executive roles on various television shows, including The View. *Id.* She has also "assisted in launching new shows and produced content for The Oprah Winfrey Show, Tyler Perry Studios, BET Network, and PBS," among others. *Id.* ¶¶ 1, 3. In early 2022, Knocking hired Carter as its chief content officer. *Id.* ¶ 165. As a condition of employment, Carter signed an employment agreement and executed a non-competition, proprietary information and inventions agreement (an "NCPIIPA"). *Id.*; *see also* Ex. K, Dkt. 200-14 (employment agreement with NCPIIPA included as an exhibit thereto).[5] Although the parties

---

Jonathan A. Herstoff, Dkts. 171 (sealed), 191 (public), 213 (sealed), 224 (public). Citations to alphabetical exhibits (*e.g.*, "Ex. A") refer to Plaintiff's exhibits appended to the Declaration of Thomas H. Herndon, Jr., Dkts. 200-3 (sealed), 209-3 (public).

[4] Knocking asserts that its model "creates a closed ecosystem through which media companies can supplement their revenue, historically limited to advertising, to include retail revenue, while brand partners can grow their sales without directly bearing marketing costs." SOMF ¶ 158 (citing Ex. C, Dkt. 200-6 at 96:25–97:18). Defendants dispute this, noting that "[t]he testimony cited by Knocking does not contain any mention of how Knocking tailored segments to consumer products or how media partners supplemented their revenue." *Id.*

[5] Section 2 of the NCPIIPA is entitled "Confidential Information and Materials." *See* Ex. K, Dkt. 209-14. Section 2.1 defines "Proprietary Information" as "all information, data, and materials relating to the Business of the Company, including without limitation: (i) trade secrets, inventions, mask works, ideas, formulas, processes, prototypes, models, source and object codes, data, know-how, improvements, discoveries, designs and techniques developed, created, conceived of or reduced to practice by any employee or contractor of the Company (including by [Carter] in the course of [Carter's] employment/engagement); (ii) the nature and description of development and business plans for the Company, including plans for research and future products, budgets, marketing, customer data and information relating to relationships between the Company and other entities, including licenses and other contracts; (iii) reports and data developed or acquired by the Company (including any data developed by [Knocking]

dispute the reasons for Carter's ultimate departure[6] from the company, it is undisputed that she remained with Knocking until February 2024, at which time her contract was not renewed. *Id.* ¶¶ 60, 170. It is also undisputed that beginning in around October 2023—several months before her contract concluded and while still employed by Knocking—"Carter began forwarding, from her Knocking email account to her personal [email] address," links and documents, including sales figures, weekly update emails, marketing reports, production budget information, internal cost analyses, revenue share details, and company contact lists, and other materials related to her role at Knocking. *See id.* ¶¶ 57–58, 174–176.[7] On February 26, 2024, after her employment at

---

hereunder and documented in tangible form, which items are and shall remain at all times the sole and exclusive property of the Company); and (iv) forms, policies, handbooks and other forms of written and nonwritten (including tangible) data, experience and information, whether of a technical, operation, or economic nature relating to the business, services and employees of the Company." *Id.* § 2.1.

Section 2.2 of the NCPIIPA prevents the unauthorized disclosure of Knocking's proprietary information. It states: "[Carter] acknowledges and agrees that disclosure of the Proprietary Information would adversely affect the Business of the Company and provide the recipient of the Proprietary Information with a substantial and unfair competitive advantage. Therefore, during [Carter's] relationship with the Company and at all times thereafter, [Carter] shall not use for any purpose other than the furtherance of the Business of the Company, or disclose to any person, any Proprietary Information of the Company. Upon Termination, or sooner if so requested by the Company, [Carter] shall immediately surrender and turn over to the Company all documents regarding Proprietary Information, including without limitation any and all documents relating to the Company or the Business of the Company, any and all computer programs (whether or not completed or in use), any and all operating manuals or similar materials that constitute the systems, policies, procedures and methods of doing business developed by the Company, as well as keys, equipment, identification or credit cards and all other property belonging to the Company. [Carter] understands that all such documents and materials are the sole property of the Company and that [Carter] shall not make or keep any copies thereof. The foregoing confidentiality and non-disclosure covenants shall not apply to Proprietary Information that: (i) has been made public voluntarily by the party to whom such information belongs; (ii) has been developed independently without access to the Proprietary Information; (iii) has been received, or is later received, separately from a source not under an obligation of confidentiality; or (iv) has otherwise become publicly available without violation of any obligation of confidentiality or other obligation to the party to whom such information belongs or under law. Upon Termination, [Carter] shall not use or permit to be used for any purpose any Proprietary Information without the express prior written consent of the Company." *Id.* § 2.2.

[6] Knocking asserts that its decision not to renew Carter's contract was performance related, as "Carter entirely failed to meet any of her bonus or other incentives during her two years as Knocking's CCO," SOMF ¶ 170; Carter disputes that, *id.*, and indicates that her decision to leave Knocking was rooted in an employment dispute regarding allegedly unpaid revenue share bonuses. *Id.* ¶ 60. The reason(s) for Carter's departure are not material to the summary judgment motion.

[7] Knocking refers to this group of seventeen communications as the "Forwarded Emails." *Id.* ¶ 175 (citing Ex. M, Dkt. 200-16, through Ex. BB, Dkt. 200-31, and Ex. MM, Dkt. 200-42). The parties dispute whether the material in the Forwarded Emails is (i) confidential, or (ii) can be characterized as Knocking's proprietary "trade secrets." *See id.* ¶¶ 57–58, 174–175. Carter claims she forwarded the emails to her personal account so that she would have records "to substantiate her value and achievements[] and calculate her bonus to which she believed she

Knocking had ended, Carter incorporated Cistus. *Id.* ¶ 64.[8] Cistus directly competes with Knocking by providing the same sorts of e-commerce and marketing services to media companies and brand partners. *See generally* FAC. Carter testified that Cistus had no employees or contractors until October 2024, when it secured its first client: BET. SOMF ¶¶ 65, 80.[9] Obtaining BET as a Cistus client is particularly significant to this lawsuit, as Carter had tried and failed to obtain BET as a client during her tenure at Knocking. *See id.* ¶ 66 (citing Ex. A, Dkt. 200-4 at 154:8–10).[10] Moreover, when Cistus launched, "[a]t least six of [its] brand partners . . . were pre-existing Knocking brand partners." *Id.* ¶ 195.

Defendant Pitcher worked with Knocking from October 2018 until November 2024. *Id.* ¶¶ 24–28, 160–164.[11] She performed a variety of roles including translating branch product

---

was entitled." *Id.* ¶ 57. Knocking asserts that "[t]he substance of the Forwarded Emails went well beyond anything Carter could have needed to support [her] bonus claim" and speculates that Carter was already "surreptitiously planning her exit from Knocking" in October 2023. *Id.* ¶¶ 171, 178.

Carter also testified that she regularly used her personal email to conduct Knocking business and that such use was neither covert nor precluded by her employment agreement or the NCPIIPA. *Id.* ¶ 59. Although Knocking disputes that Carter used her personal email, *see id.* ¶¶ 37, 59, it has largely failed to rebut Carter's testimony with evidence to the contrary and notes only that "Carter failed to produce any emails from her personal account during discovery demonstrative of [her] alleged interchangeable use of" email accounts, *id.* ¶ 37.

[8] Knocking does not dispute that Cistus was not incorporated until February 2024 but notes that "the Cistus domain name was registered on January 31, 2024, the day before [Carter's] Knocking employment ended." *Id.* ¶ 64.

[9] Knocking quarrels with this assertion but states only that "Pitcher confirmed at [her] deposition that she and Carter began discussing a new business venture in 'end of January, beginning of February 2024.'" *Id.* ¶ 65. Knocking claims this this alone "demonstrates that Pitcher [and Carter were] planning a competing venture and committing to support it during" their time at Knocking. *Id.* It is not clear that the record supports such an inference. In any event, the Court accepts as true only that Cistus was not formally staffed until October 2024 and did not announce its partnership with BET to develop a "curated marketplace" until November 13, 2024. *Id.* ¶ 80.

[10] Knocking claims—without citation to the record—that Carter "secured BET as a client for Cistus using contacts, strategies, institutional knowledge, and pitch materials developed during and paid for by her employment at Knocking." *Id.* ¶ 66. It also asserts—again, without citation—that "during the period Carter was employed and compensated by Knocking to pursue a BET partnership, she did not utilize the same personal network she later deployed for Cistus, underscoring that her Cistus outreach built upon groundwork developed at Knocking's expense." *Id.*; *see also id.* ¶¶ 67–76.

[11] The parties vigorously dispute whether Pitcher was formally employed by Knocking or worked only as an independent contractor. Knocking claims that "Pitcher was initially hired as a contractor" but that "her role grew and developed over time." *Id.* ¶ 160. Defendants counter that Pitcher held various titles during her six years with Knocking, but her work with the company "was neither continuous nor exclusive, as she simultaneously pursued

information from English to Spanish, *id.* ¶ 25; using information provided by brand partners to create and publish product listings in Knocking's Shopify store, *id.* ¶ 26; and "improving Knocking's scalability" by "working with Knocking's technology team to improve their store design and optimizing the conversion rate for brand partners," *id.* ¶ 27. There is no evidence that Pitcher ever signed a consulting or employment agreement, nor that she ever executed Knocking's form NCPIIPA. *See id.* ¶ 32.[12]

In November 2023, Carter, Pitcher, and a Knocking graphic designer created an introductory pitch deck to try to land BET as a client. *Id.* ¶ 47. The deck was circulated internally. *Id.* ¶ 49. Carter was never able to secure a meeting with BET while at Knocking, and Knocking never partnered with BET during Carter's (or Pitcher's) tenure with the company. *See id.* ¶¶ 54–55.

At some point in 2024—after Carter had left Knocking—Pitcher began consulting with Carter on "some" Cistus "projects." *Id.* ¶ 81. On February 6, 2024, for example, prior to Cistus's formal incorporation, and "while [] Pitcher [was] still employed by Knocking," Carter

---

freelance projects and [also] worked for Shopify." *Id.* ¶ 25. Knocking disputes that "Pitcher's engagement with Knocking was non-continuous" but seems not to dispute Pitcher's testimony that she had "breaks in between" stints at Knocking and was only engaged "more frequently" in mid-2020. *Id.* This disputed question of fact is immaterial to resolving the summary judgment motion.

[12] Knocking acknowledges that Pitcher testified that "she never signed a consulting agreement, did not sign any other agreement with Knocking, and was never required to sign" an NCPIIPA but "disputes that this absence of signed agreements resolves the trade secret claim," asserting in a conclusory fashion that "agreements were required and executed," *id.* ¶ 32 (internal citations omitted), and "the absence of a produced copy [of a contract] does not establish that no agreement was executed," *id.* ¶ 33. Knocking even suggests that its lack of proof is based on *Pitcher's* failure to "produce[] a single document or communication related to her initial hiring by Knocking," as opposed to its own shoddy recordkeeping. *Id.* ¶¶ 163–164 (emphases omitted).

The Court agrees with Defendants that Knocking's "inability to locate documents that should be in its possession, custody, or control[] cannot be attributed to" Pitcher. *Id.* ¶ 164. Thus, to the extent that Pitcher's having executed an employment agreement or NCPIIPA is a material fact, the Court concludes that it is not seriously in dispute as no reasonable jury could conclude, based on the record in this case, that she signed a contract with Knocking.

emailed Pitcher (and Spencer) "a Cistus pitch deck[13] and solicited [] input on her plans for developing the business." *Id.* ¶ 186 (citing Ex. H, Dkt. 200-11). Knocking also contends that "[f]rom Cistus's formation in February 2024 until the public launch of Cistus's BET e-commerce website, Pitcher surreptitiously worked for Cistus without disclosing this relationship to Knocking." *Id.* ¶ 188.[14] Pitcher also approved Spencer to liaise with various brand partners on behalf of Cistus prior to the company's launch, including brands with which Knocking had a prior (but not exclusive) relationship. *See id.* ¶ 195; *see also id.* ¶¶ 204–205.[15] Knocking terminated its relationship with Pitcher on November 15, 2024, after learning[16] that Pitcher was consulting with a competitor. *Id.* ¶ 82. Pitcher eventually received an equity interest in Cistus, *see id.* ¶ 196, and is now a part-owner of the company, *see* Ex. SS, Dkt. 200-48 ¶ 1.

This lawsuit ensued. During discovery, it came to light that Pitcher had used her personal laptop to "access [Knocking] documents [through] Knocking's Google drive," *see* Ex. D, Dkt.

---

[13] The deck was not client-specific and provided a general outline of Cistus's vision and business model. *See* Ex. H, Dkt. 200-11. A slide titled "Meet the Team" listed Pitcher as Cistus's COO and co-founder. *Id.*

[14] To support this claim, Knocking cites exactly four pieces of evidence: (i) a December 21, 2023, email from an unspecified sender to a cohort of recipients, including "admin@cistusmedia.com," that implies the existence of a Cistus-centric Slack channel, *see* Ex. DD, Dkt. 200-33; (ii) a September 2024 email chain between "admin@cistusmedia.com" and employees of Paramount regarding "Materials for BET+Cistus Media," *see* Ex. EE, Dkt. 200-34; (iii) an October 2024 email chain between "admin@cistusmedia.com" and a potential brand partner, PrimeTech Safety, regarding e-commerce opportunities on BET, *see* Ex. FF, Dkt. 200-35; and (iv) the February 2024 email and Cistus introductory pitch deck previously discussed, *see* Ex. H, Dkt. 200-11.

Defendants concede that Pitcher controlled the "admin@cistusmedia.com" account and even employed a pseudonym on some Cistus materials, *see* Ex. KK, Dkt. 200-40 (Cistus introductory leaflet with "Catherine Rodriguez" listed as a brand partnership contact associated with the "admin" email address), but asserts that the evidence does not support a conclusion that Pitcher was trying to conceal duplicitous conduct. *See* SOMF ¶¶ 188–191. Defendants also note that Knocking provides "no record evidence that would [have] obligate[d] Pitcher to disclose her work with other companies," nor "any evidence of a restrictive covenant[] such as a non-compete or non-solicitation agreement that would prohibit" Pitcher from working with Cistus. *Id.* ¶ 188.

[15] Defendants contend, and the Court acknowledges, that Knocking has not pointed to any evidence that Pitcher was simultaneously soliciting or engaging with the same brands for Cistus and Knocking. *Id.* ¶ 195.

[16] On November 13, 2024, Carter emailed Pitcher (at her Knocking email address) an agreement for future equity between Cistus, Valerie Mosley of Valmo Ventures, and Inspira Financial Trust, LLC, with a note that Cistus had received $40,000 in financing. *Id.* ¶ 206.

200-7 at 79:2–5, and had occasionally downloaded Knocking documents to a local folder before uploading the final version to Knocking's Google workspace, *see* SOMF ¶ 212. By mid-2025, Knocking had learned that Pitcher was no longer in possession of the laptop that she used when she was working for Knocking. *See id.* ¶ 211. Knocking moved to compel production of "all documents and communications related to Pitcher's former laptop." *See* Dkt. 148. By order dated December 16, 2025, Magistrate Judge Ricardo directed Defendants "to locate Pitcher's former laptop and determine its current status" or "i[f] . . . unable to locate Pitcher's former laptop," to "provide a declaration describing what happened to the laptop and when." Dkt. 153. On January 9, 2026, Pitcher submitted a declaration stating that she had "deleted all files from [her] time working with Knocking" in November 2024[17] and reset the laptop in February 2025 before gifting it to her sister-in-law, Zainub Ishaq. Ex. SS, Dkt. 200-48 ¶¶ 4, 7–8. In a separate sworn declaration, Ishaq confirmed that she was with Pitcher when she reset the laptop in February 2025. Ex. 50, Dkt. 213-9 ¶ 2. Ishaq also confirmed that the laptop was not functioning properly prior to and after Pitcher gave it to her. *Id.* Although Ishaq tried to fix the device to use for her "day-to-day computer needs," she ultimately could not, and disposed of the laptop in June 2025. *Id.* ¶ 3.

Knocking claims that by resetting her laptop "during the pendency of this action," Pitcher "permanently foreclosed Knocking's opportunity to forensically image the device to verify her claims" regarding whether Knocking's proprietary information did—or did not—exist on the device. SOMF ¶ 216; *see also id.* ¶ 194 ("Knocking has been unable to ascertain the full scope of Pitcher's misappropriation because Pitcher destroyed her laptop during the course of

---

[17] *See also* SOMF ¶ 83 (citing Pitcher Decl., Dkt. 93-1 ¶ 8). Knocking disputes this and asserts that "[i]n light of the various steps Pitcher took to conceal her relationship and intentional destruction of the laptop containing these files, this representation is uncredible." *Id.* ¶ 83.

discovery, prior to even disclosing its existence."). Accordingly, Knocking moved for spoliation sanctions and a "finding, as a matter of law, that Pitcher misappropriated its trade secrets." Pl. Opp. & Spol. Mot. at 29.

## LEGAL STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (internal quotation marks omitted).

Although the Court must construe the facts in the light most favorable to the non-moving party, "a party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Fed. Trade Comm'n v. Moses*, 913 F.3d 297, 305 (2d Cir. 2019) (internal quotation marks omitted). Accordingly, to defeat a motion for summary judgment, the nonmoving party must produce specific facts showing that there is a genuine issue for trial; a "scintilla of evidence" is not enough. *Fincher v. Depository Tr. & Clearing Corp.*, 604 F.3d 712, 726 (2d Cir. 2010); *see also Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 169 (2d Cir. 2006); *D'Amico v. City of N.Y.*, 132 F.3d 145, 149 (2d Cir. 1998) (a party "must offer some hard evidence showing that its version of the events is not wholly fanciful"); *Baity v. Kralik*, 51 F. Supp. 3d 414, 417–18 (S.D.N.Y. 2014) (a party opposing summary judgment must "specifically respond to the assertion of each purported undisputed fact . . . and, if controverting any such fact, [must] support its position by citing to admissible evidence in the record").

## DISCUSSION

The First Amended Complaint includes claims for: (i) violations of the DTSA, 18 U.S.C. § 1836 *et seq.* (against all Defendants); (ii) common law misappropriation of trade secrets (against all Defendants); (iii) tortious interference with contract against Carter; (iv) aiding and abetting the common law misappropriation of trade secrets against Cistus and Pitcher; (v) civil conspiracy regarding the misappropriation of trade secrets against Cistus and Pitcher; (vi) unjust enrichment against Cistus; (vii) breach of contract against Carter and Pitcher; (viii) breach of the duty of loyalty against Pitcher; and (ix) breach of the covenant of good faith and fair dealing against Carter and Pitcher. *See* FAC ¶¶ 81–164.

### I. The Trade Secrets Claims (Counts I, II)

#### *a. Legal Standard*

The federal DTSA requires proof that a trade secret was misappropriated either by acquisition of the trade secret through improper means or disclosure or use of the trade secret without consent. *See Democratic Nat'l Comm. v. Russian Fed.*, 392 F. Supp. 3d 410, 447 (S.D.N.Y. 2019); *Medidata Sols., Inc. v. Veeva Sys. Inc.*, No. 17 Civ. 589 (LGS), 2018 WL 6173349, at *4 (S.D.N.Y. Nov. 26, 2018); 18 U.S.C. §§ 1831–39. Under New York and Connecticut[18] law, the requirements are largely the same: "[a] plaintiff claiming misappropriation of a trade secret must prove that: (1) it possessed a trade secret, and (2) defendant is using that trade secret in breach of an agreement, confidence, or duty, or as a result of discovery by improper means." *E.J. Brooks Co. v. Cambridge Sec. Seals*, 31 N.Y.3d 441, 452 (2018); *see also Cont'l Indus. Grp., Inc. v. Altunkilic*, 788 F. App'x 37, 40 (2d Cir. 2019)

[18] Presumably because Carter's employment contract includes a non-dispositive Connecticut choice-of-law provision, *see* Ex. K, Dkt. 200-14 § 9.3, Plaintiff seeks all remedies permitted under New York or Connecticut law for various of its causes of actions, *see* FAC at 28–29. Accordingly, the Court has assessed the viability of Plaintiff's claims under the laws of each state, where applicable.

(summary order); *Sunbelt Rentals, Inc. v. McAndrews*, 552 F. Supp. 3d 319, 330 n.2 (D. Conn. 2021) (under the Connecticut Uniform Trade Secrets Act, a plaintiff must "demonstrate the existence of a trade secret that the defendant misappropriated"). Because the elements are nearly identical, Courts often rely on cases discussing New York law to analyze DTSA claims. *See, e.g.*, *Elsevier Inc. v. Dr. Evidence, LLC*, No. 17-CV-5540, 2018 WL 557906 (KBF), at *3 (S.D.N.Y. Jan. 23, 2018); *In re Document Techs. Litig.*, 275 F. Supp. 3d 454, 461–62 (S.D.N.Y. 2017); *Free Country Ltd. v. Drennen*, 235 F. Supp. 3d 559, 565 (S.D.N.Y. 2016).

*b. Application*

Knocking has identified several categories of information that, it claims, constitute protectible trade secrets: (1) the identities and contact information of decision-makers at its brand partners; (2) the specific contractual terms governing Knocking's relationships with its brand partners, including per-brand and per-product revenue; (3) go-to market strategies; (4) historical sales data; and (5) strategic plans and development strategies for pitching media partners, including BET. *See* FAC ¶¶ 24–25, 83–84; Pl. Opp. & Spol. Mot. at 5. In particular, Knocking asserts that "[t]he Forwarded Emails" sent from Carter to her personal account include "confidential marketing reports, production budget information, sales reports, internal cost analyses, sales comparisons, revenue share details, profit/loss statements, strategic planning emails, internal brand partner solicitation communications, and company contact lists," which "comprise the trade secrets at dispute." Pl. Opp. & Spol. Mot. at 5. For purposes of the instant motion, the Court assumes, without deciding, that the information Knocking has identified does, in fact, constitute trade secret information and that Plaintiff has met its burden on this element.[19]

[19] As a threshold matter, to survive summary judgment, a plaintiff asserting trade secret misappropriation must provide credible evidence that the trade secret exists and is ascertainable. *Next Commc'ns, Inc. v. Viber Media, Inc.*, 758 F. App'x 46, 48 (2d Cir. 2018) (summary order). Under the DTSA, a "trade secret" includes business information that "derives independent economic value . . . from not being generally known to, and not being readily ascertainable through proper means," and which "the owner thereof has taken reasonable measures to

The pivotal question, then, is whether there is a triable question whether Defendants misappropriated Knocking's trade secrets. The DTSA defines misappropriation as (1) the acquisition of a trade secret by a person who knew or had reason to know that the trade secret was acquired by improper means; or (2) the disclosure or use of a trade secret without express or implied consent by a person who acquired it through improper means. 18 U.S.C. § 1839(5). "Improper means" under the DTSA includes theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy and espionage through electronic or other means, but does not include reverse engineering, independent derivation or any other lawful means of acquisition. *Id.* § 1839(6). "The statute therefore contemplates three theories of liability: (1) acquisition, (2) disclosure, or (3) use." *eShares, Inc. v. Talton*, 727 F. Supp. 3d 482,

---

keep . . . secret." 18 U.S.C. § 1893(3). The party seeking protection must describe the "alleged trade secret with adequate specificity to inform the defendants what it is alleged to have appropriated." *Town & Country Linen Corp. v. Ingenious Designs LLC*, 556 F. Supp. 3d 222, 270 (S.D.N.Y. 2021) (quoting *Sit-Up Ltd. v. IAC/InterActiveCorp.*, No. 05 Civ. 9292 (DLC), 2008 WL 463884, at *11 (S.D.N.Y. Feb. 20, 2008)).

The parties spill much ink arguing whether each of these elements has been met. *See* Def. Br. at 7–16 (arguing that (i) Knocking fails to describe its trade secrets with requisite specificity; (ii) Knocking did not take reasonable measures to protect its alleged trade secrets; and (iii) the alleged trade secrets do not derive independent value from being kept secret); Pl. Opp. & Spol. Mot. at 4–14 (arguing the opposite). At a high level, the types of information Knocking identifies as its trade secrets are protectible. For example, data relating to product pricing and costs are protectable, *see In re Dana Corp.*, 574 F.3d 129, 152 (2d Cir. 2009), as is information relating to customers, *see N. Atl. Instruments, Inc. v. Haber*, 188 F.3d 38, 44 (2d Cir. 1999), and business and marketing information, *see Art & Cook, Inc. v. Haber*, 416 F. Supp. 3d 191, 197 (E.D.N.Y. 2017). Although vague references to "overall business plans" is too broad to constitute a trade secret, specific data underpinning "go-to market" strategies—such as "information reflecting the size of potential markets for [] products," "the processes and data [a company] uses to assess growth targets for products," "internal and market information for specific geographic regions," and "market share" information—is the type of "discrete," "proprietary data" that routinely warrants protection. *Medidata Sols., Inc. v. Veeva Sys., Inc*, No. 17 Civ. 589 (LGS), 2021 WL 467110, at *9 (S.D.N.Y. Feb. 9, 2021). Whether Plaintiff has proffered adequate "cit[ations] to particular [] materials in the record," *id.* at *3 (citing Fed. R. Civ. P. 56(c)(1)(A)), that would permit a reasonable juror to conclude that Defendants misappropriated these trade secrets is a separate question.

There are also disputed questions of fact as to whether Knocking took appropriate measures to protect its trade secrets and whether those trade secrets derive independent economic value from their confidentiality. *See* Def. Br. at 11–16; Pl. Opp. & Spol. Mot. at 8–14. Still, Defendants concede that Plaintiff exercised some level of caution in protecting most of the materials in question, including with the use of confidentiality agreements, password protections, and internal databases accessible only to Knocking personnel. Def. Br. at 11–14. It also seems likely that, assuming Knocking has identified protectible trade secrets, Knocking would financially benefit from that information being kept secret. Construing the evidence in the light most favorable to Knocking, as the Court must, the Court declines to grant summary judgment on either of these bases.

493 (S.D.N.Y. 2024) (quoting *Better Holdco, Inc. v. Beeline Loans, Inc.*, 666 F. Supp. 3d 328, 389 (S.D.N.Y. 2023)).

Construing the evidentiary record in the light most favorable to Knocking, a reasonable jury could not find liability on any of these bases. Consider first Plaintiff's allegation that Carter improperly acquired or disclosed Knocking's trade secrets by including them in emails forwarded from her Knocking account to her personal email address. *See id.* ¶¶ 57–58, 174–176; *see also* supra n.7. Plaintiff's opening brief dedicates three sentences to this theory before concluding that the Forwarded Emails are evidence of Carter's "acquisition of Knocking's trade secrets," which is "a textbook case of misappropriation." Pl. Opp. & Spol. Mot. at 15–16.

Although "Plaintiff would have this Court find that merely transferring information containing trade secrets to a personal device" or account "is sufficient to" sustain its DTSA claim, "[t]he DTSA, while a broad statute, is not so sweeping." *eShares, Inc.*, 727 F. Supp. 3d at 493. The crux of any trade secrets claim is the acquisition or disclosure by improper means—the DTSA's use of terms including "theft," "espionage," and "breach of duty to maintain secrecy" imply "a level of impropriety that merely accessing or downloading documents onto a personal device does not implicate." *Id.* "It cannot be that every employee who simply accesses documents containing alleged proprietary information on a personal device . . . has now violated federal law." *Id.* (collecting cases). As such, this Court has determined "that transferring confidential information and trade secrets to a personal account" can only "constitute[] acquisition by improper means under the DTSA when two elements are met: (1) the employee was directed not to share the information outside of employer-issued devices—whether, for example, through a policy or employment-related contract; and (2) the employee transferred the

information outside of an employer-issued device for an improper or illegitimate purpose." *Id.* at 494.[20]

As to the first element, Plaintiff maintains that the act of forwarding emails to herself was "in breach of [Carter's] NCPIIPA." Pl. Opp. & Spol. Mot. at 16. The record evidence does not support that claim. Nowhere in Carter's confidentiality agreement does it suggest that she cannot utilize her personal email address to conduct Knocking business, nor that she must refrain from sending documents containing Knocking's proprietary information to her personal accounts. *See generally* Ex. K, Dkt. 200-14. Indeed, Carter testified that she regularly used her personal email for Knocking business—a claim that Plaintiff is largely unable to rebut. *See* SOMF ¶ 37. To the extent Knocking is arguing that the act of forwarding confidential information to a personal device was in violation of Knocking's internal policies and directives, this too would fail. Knocking cannot point to a single instance in which Carter was directed not to send proprietary business information to her personal account, nor is there any evidence that Knocking maintained a policy, formal or otherwise, precluding such conduct. Indeed, the evidence suggests that Knocking took an extremely laissez faire approach to monitoring the flow of its confidential information specifically *because* it "could not control the hardware" that its employees used and instead relied almost exclusively on the terms of the NCPIIPA to safeguard its information. *See id.* ¶ 103. Whether that strategy was "appropriate for a startup," *id.* ¶ 103, is debatable; ultimately, though, the adequacy of the strategy has no bearing on the fact that Knocking's internal procedures did not prohibit employees from using personal devices or email accounts.

---

[20] Collecting cases, including *Lodging Sols., LLC v. Miller*, No. 19-CV-10806 (AJN), 2020 WL 6875255, at *3 (S.D.N.Y. Nov. 23, 2020), *Onyx Renewable Partners L.P. v. Kao*, No. 22-CV-3720 (RA), 2023 WL 405019, at *4 (S.D.N.Y. Jan. 25, 2023), *ExpertConnect, L.L.C. v. Fowler*, No. 18-CV-4828 (LGS), 2019 WL 3004161, at *6 (S.D.N.Y. July 10, 2019), and *DASH Regul. Techs., LLC v. Axiom Software Lab'ys Inc.*, No. 21-CV-8751 (JGK), 2023 WL 2586104, at *5 (S.D.N.Y. Mar. 21, 2023).

Knocking's vague references to Thomson Reuters information security training also do not establish that Carter's conduct violated the company's rules. First, although that training warned against the use of personal devices and recommended that confidential information be transmitted only through secure networks, *id.* ¶ 108, Knocking seems to concede that the some of the training "did not specifically apply to Knocking's operating environment," *id.*, and does not directly dispute[21] that it *allowed* its employees and contractors to use personal devices for work, *id.* ¶ 109. Second, there is no admissible[22] evidence that either Carter or Pitcher ever completed that training. *See id.* ¶¶ 105–106. Simply put, there is nothing in the record from which a jury could conclude that Carter was, in fact, directed not to share confidential information to her personal accounts. This dooms Plaintiff's improper acquisition theory.

Alternatively, Knocking asserts that Defendants improperly *used* Knocking's trade secrets. Pl. Opp. & Spol. Mot. at 16–17. With regard to Carter, Knocking notes that she "incorporated Cistus as a direct competitor" "within weeks of her separation from Knocking." It further asserts that she "used her access to Knocking's proprietary information to develop Cistus's business, ultimately launching an e-commerce platform with BET that featured at least six of Knocking's brand partners." *Id.* at 16. But Plaintiff fails to support its theory of use with "citation[s] to particular parts of materials in the record"—which is necessary for the Court to credit Knocking's allegations as anything more than conclusory speculation. *See Medidata*,

21 Knocking's only response to evidence that the company "allowed employees and contractors to use personal devices, did not monitor those devices, and did not have VPN or encryption services" is that the inclusion in the Thomson Reuters training of "generic content does not negate the training's core instruction on confidentiality obligations." SOMF ¶ 109. Maybe so, but that does not alter Knocking's sworn testimony that the company does not offer company-issued electronic devices or otherwise require that its materials be accessed only via secure networks. *See* Ex. 40, Dkt. 171-40 at 40:12–14, 54:8–21, 59:4–5, 127:5–9.

22 Defendants claim that "Knocking has not produced any documents showing that Carter or Pitcher ever completed" the information security trainings discussed here. SOMF ¶ 105; *see also id.* ¶ 106. Knocking disputes this and claims it "has evidence demonstrating that both Pitcher and Carter completed the required information security training in 2022" but acknowledges that Judge Ricardo "struck the evidence on the basis that" it was not timely produced and is, therefore, inadmissible. *Id.* ¶¶ 105–106.

2021 WL 467110, at *3 (citing Fed. R. Civ. P. 56(c)(1)(A)). Simply because Defendants may have had "access and visibility to [Knocking's] confidential information" does not, *ipso facto*, prove that Defendants relied on the information to create Cistus or to cultivate Cistus clients. *See* SOMF ¶ 134. A review of the Forwarded Emails makes it difficult to discern how or why they would have. Various of the Forwarded Emails include trivial snapshots of sales figures, budget, and market information that would have been stale and largely irrelevant to Cistus when it was preparing for launch in 2024. *See, e.g.*, Ex. Q, Dkt. 200-20 (2022 email regarding costs associated with "two-day shoots"); Ex. R, Dkt. 200-21 (2022 email regarding production costs and tax credits for shoots in Connecticut); Ex. U, Dkt. 200-24 (email from third party providing June 2020 market coverage and revenue for thirty station groups); Ex. Y, Dkt. 200-28 (sales update from week of December 11, 2023, with high-level bullets); Ex. MM, Dkt. 200-42 (sales update from week of November 27, 2023, with high-level bullets).

The Forwarded Emails that may have been the most relevant to Cistus (based on their subject lines) are also unhelpful to Plaintiff because Knocking did not produce the email attachments in which its proprietary information was purportedly contained. *See, e.g.*, Ex. P, Dkt. 200-19 (2023 email to CBS, without attached slide deck); Ex. T, Dkt. 200-23 (2022 email from third party regarding consumer insights, without attached PDF whitepaper); Ex. W, Dkt. 200-26 (textless 2022 email regarding "Knocking White Paper," without attached PDF whitepaper); Ex. X, Dkt. 200-27 (textless 2023 email, marked confidential, including PDF and PowerPoint deck, without attachments); Ex. Z, Dkt. 200-29 (email regarding 2021 production costs, without attached spreadsheet); Ex. AA, Dkt. 200-30 (email regarding 2021/2022 airings and sales for brand partner, without attached images or spreadsheet). Various other emails include links to documents on Knocking's internal workspaces, Carter's access to which would have necessarily terminated when she departed the company. *See, e.g.*, Ex. O, Dkt. 200-18 (link

to partner contact list); Ex. V, Dkt. 200-25 (link to social media contact list); Ex. S, Dkt. 200-22 (link to mid-2022 social media report). Thus, although the Court is assuming that the Forwarded Emails include proprietary, trade secret information, *see supra* at 11, the Court's inability to assess the contents of these documents severely hampers Plaintiff's ability to create a question of fact regarding whether Defendants actually wanted to, or did, use any of the purported trade secrets.

The most fundamental issue for Plaintiff is that the record is devoid of anything that would permit a reasonable juror to infer that Defendants relied on, copied, or otherwise used the information in the Forwarded Emails to (i) create Cistus, or (ii) secure BET's business. The conclusory allegation that Defendants must have misappropriated Knocking's trade secrets because Carter forwarded emails to herself is not enough to sustain Plaintiff's trade secrets claim at this stage of the litigation.[23] In other words, it is insufficient to claim, as Plaintiff does, that Defendants somehow secured BET's business at Cistus because they misappropriated "the knowledge and strategies"[24] underpinning Knocking's own (failed) BET pitch. *See* SOMF ¶¶ 96, 130. Such a vague formulation of the allegedly misappropriated information does not satisfy Plaintiff's obligation to specify its protectible trade secret. *See Medidata*, 2021 WL 467110, at *9 ("[N]o reasonable juror could discern from [Plaintiff's] description what specific items relating to [its] 'overall business plans'" and "strategies" constitute the claimed secrets). Even if

---

[23] Knocking's own executives readily admit that it is not clear that Defendants "took and used" the company's confidential information. *See* Ex. C., Dkt. 200-6 at 60:6–61:3. Plaintiff's claim that it simply needs to demonstrate a "plausible inference of misappropriation" to survive summary judgment is only partially correct. SOMF ¶ 133. At summary judgment, the critical question is whether the record contains sufficient evidence for a jury to find misappropriation under the applicable legal tests. *See Henessey Food Consulting LLC v. Prinova Sols., LLC*, No. 20-CV-0806 (TWD), 2024 WL 4291312, at *6–7 (N.D.N.Y. Sept. 24, 2024). An inference alone, untethered from specific evidentiary support, will not suffice.

[24] Knocking does not dispute that the BET pitch deck Carter and Pitcher prepared for Knocking did not contain any confidential, trade-secret information, nor did it include evidence of Knocking's strategic plans. SOMF ¶ 96.

it did, without some connective tissue linking the trade secrets purportedly exposed in the Forwarded Emails to Cistus's creation,[25] its operations, or its ability to win BET's business,[26] Plaintiff's theory of liability based on Carter improper use of Knocking's information fails.[27]

Knocking's improper use case against Pitcher[28] is weaker still. That another Cistus employee (Spencer) solicited Knocking's non-exclusive brand partners on Cistus's behalf while Pitcher was working with Knocking does not indicate that "Pitcher was simultaneously soliciting and engaged with those brands on behalf of both companies without Knocking's knowledge," nor is it "evidence that [] Pitcher . . . understood [she] w[as] using Knocking's proprietary brand relationships for Cistus's benefit." Pl. Opp. & Spol. Mot. at 17. The mere existence of common

[25] Carter, a veteran of the industry, was not subject to a non-compete after leaving Knocking. SOMF ¶ 63.

[26] Although it is not the basis for this decision, the Court also notes that Knocking's theory of misappropriation regarding Cistus's solicitation of BET defies common sense. It is undisputed that while at Cistus, Carter liaised with BET executives whom she had not met, contacted, or worked with during her time at Knocking. SOMF ¶¶ 66–76. Ironically, Knocking acknowledges that Cistus's "BET relationship was secured through Cistus contacts and channels that Carter developed through her personal network after leaving Knocking," but then vaguely asserts that the BET relationship was built "using institutional knowledge, strategies, and deal structures developed at Knocking's expense." *Id.* ¶ 70 (emphases added). Knocking cannot point to a lick of evidence that supports this claim. Furthermore, it makes sense that Carter would have leveraged different relationships and strategies at Cistus, inasmuch as she previously failed to win a meeting with BET during her tenure at Knocking. *See* SOMF ¶ 66 (citing Ex. A, Dkt. 200-4 at 154:8–10). To the extent Knocking could specifically identify the "institutional knowledge, strategies, and deal structures" that Carter later pulled from, it is not at all clear why Carter would have pursued a similar strategy when soliciting BET's business at Cistus (when the Knocking strategy appears to have gained no traction). Surely Knocking is not claiming that its proprietary, crown-jewel, trade-secret information consists of what *not* to do.

[27] The Court agrees with Plaintiff that the misappropriation of a trade secret is often proven by "a web of perhaps ambiguous circumstantial evidence from which the trier of fact may draw inferences which convince [them] that it is more probable than not what plaintiffs allege happened did in fact take place." *Linkco, Inc. v. Fujitsu Ltd.*, 00 Civ. 7242 (SAS), 2002 WL 237838, at *3 (S.D.N.Y. Feb. 19, 2002) (quoting *Q-CO Indus., Inc. v. Hoffman,* 625 F. Supp. 608, 618 (S.D.N.Y. 1985)). But Plaintiff is not entitled to present its case to a jury based on a mere hunch. Plaintiff maintains the onus to point to specific evidence, circumstantial or otherwise, that "discrete categories of [its] proprietary data" or its "well-delineated processes," for example, were being exfiltrated and used by Defendants. *See Medidata*, 2021 WL 467110, at *9. Its utter failure to identify any such evidence is why summary judgment in Defendants' favor is appropriate. Stated differently: Plaintiff cannot invoke reliance on a "web" of circumstantial evidence when it has assembled, by way of the Forwarded Emails and conclusory speculation, only a handful of disconnected threads.

[28] Pitcher admitted to using her personal laptop to access, and occasionally download, Knocking documents. *See* SOMF ¶ 76. For the reasons previously stated, this does not demonstrate that those documents were "improperly" acquired. *See supra* at 13–15.

partnerships between the two companies operating within the same industry is not sufficient evidence for a jury to conclude that Pitcher misappropriated Knocking's proprietary brand information to benefit Cistus.[29] This is especially true considering that Knocking's brand partners were non-exclusive, and Pitcher was not subject to a non-compete contract that would have limited her ability to work with Cistus either while working with Knocking or after leaving. Further still, there is no record evidence (emails, messages, etc.) that anything Pitcher allegedly took from Knocking flowed to Carter or anyone else on the Cistus team or made its way into any Cistus work product.

In sum, because there is insufficient evidence for a reasonable jury to conclude that Defendants misappropriated any of Knocking's alleged trade secrets, Defendants' motion for summary judgment on Plaintiff's DTSA (Count I) and common law trade secrets (Count II) claims is GRANTED.[30]

## II. Tortious Interference Claim (Count III)

Plaintiff alleges that Carter tortiously interfered with the alleged contract between Pitcher and Knocking. FAC ¶¶ 104–120. A tortious interference with contract claim requires proof of four elements: (1) the existence of a valid contract, (2) the defendant's knowledge of the contract, (3) the defendant's intentional procurement of a breach of the contract, and (4) resulting damages. *Hoag v. Chancellor, Inc.*, 246 A.D.2d 224, 228 (1st Dep't 1998). Because Plaintiff has failed to produce any evidence that Pitcher had a contract with Knocking, its tortious interference claim necessarily fails. Defendants' motion for summary judgment on Plaintiff's tortious interference claim (Count III) is GRANTED.

---

[29] Other than the identities of the non-exclusive brand partners, Plaintiff also does not articulate a compelling theory about the sort of brand-partner information that Pitcher would have tried to leverage to give Cistus a leg up.

[30] Because Plaintiff's cannot sustain its trade secrets claims against either Carter or Pitcher, its claim against Cistus necessarily fails.

### III. Aiding and Abetting Claim (Count IV)

Plaintiff alleges that Cistus and Pitcher aided and abetted Carter's misappropriation of Knocking's trade secrets. FAC ¶¶ 121–126. A "plaintiff[] alleging aiding and abetting liability must prove an underlying tort that defendants allegedly facilitated." *Master-Halco, Inc. v. Scillia Dowling & Natarello*, LLC, 739 F. Supp. 2d 109, 1212 (D. Conn. 2010); *see also William Doyle Galleries, Inc. v. Stettner*, 167 A.D.3d 501, 503 (1st Dep't 2018). Because Plaintiff has not established the existence of an underlying tort (misappropriation of trade secrets) against Carter, it cannot establish that Cistus and Pitcher substantially assisted Carter in the commission of that tort. Defendants' motion for summary judgment on Plaintiff's aiding and abetting claim (Count IV) is GRANTED.

### IV. Civil Conspiracy Claim (Count V)

Plaintiff's civil conspiracy claim, FAC ¶¶ 127–131, like its aiding and abetting claim, is premised on Carter's underlying tortious conduct. *See Savannah Bank, N.A. v. Sav. Bank of Fingerlakes*, 261 A.D.2d 917, 917–18 (4th Dep't 1999); *Harp v. King*, 266 Conn. 747, 779 n.37 (2003). Because Plaintiff has not proven the existence of an underlying substantive tort, Defendants' motion for summary judgment on Plaintiff's civil conspiracy claim (Count V) is GRANTED.

### V. Unjust Enrichment Claim (Count VI)

Plaintiff alleges that Cistus has benefited from the use of Knocking's trade secrets, which were acquired through "improper means at Plaintiff's expense." FAC ¶¶ 132–136. The unjust enrichment claim is entirely duplicative of Plaintiff's trade secrets claims, *see supra* Section I, and fails on that basis. *Corsello v. Verizon N.Y., Inc.*, 18 N.Y.3d 777, 791–92 (2012); *Hesse v. Godiva Chocolatier, Inc.*, 463 F. Supp. 3d 453, 473 (S.D.N.Y. 2020). Plaintiff's unjust enrichment claim separately fails because Plaintiff cannot point to any evidence that Cistus

benefitted from using Knocking's alleged trade secrets or any confidential information collected at Plaintiff's expense. *See supra* at 15–19. Defendants' motion for summary judgment on Plaintiff's unjust enrichment claim (Count VI) is GRANTED.

## VI. Breach of Contract (Count VII)

As the Court has stated, it cannot be seriously disputed that Pitcher did not have an employment contract with Knocking and was not subject to an NCPIIPA; accordingly, Pitcher could not have breached the confidentiality provisions and restrictive covenants allegedly contained therein. *See supra* at 6 & n.12 (discussing Plaintiff's failure to produce a scintilla of evidence that Pitcher signed an employment agreement). Likewise, there is no evidence that Carter's act of forwarding Knocking's material to her personal account violated the confidentiality provisions in her employment agreement or NCPIIPA. *See supra* at 11–15. Because the Forwarded Emails are the only evidence that Plaintiff cites supporting its breach of contract claim against Carter, the claim fails. Defendants' motion for summary judgment on Plaintiff's breach of contract claim (Count VII) is GRANTED.

## VII. Breach of Loyalty Claim (Count VIII)

To prove a claim for breach of fiduciary duty, a plaintiff must prove: (1) the existence of a fiduciary duty between the parties; (2) breach of that duty; and (3) damages suffered as a result of the breach. *See Kurtzman v. Bergstol*, 40 A.D.3d 588, 590 (2d Dep't 2007); *Bongiorno v. J&G Realty, LLC*, 272 A.3d 700, 711 n.9 (Conn. App. 2022) (describing similar elements). Plaintiff alleges that Pitcher breached her duty of loyalty by "working for and/or assisting defendant Cistus Media, Inc., a newly formed direct competitor of Knocking," "directly transferring Knocking's [t]rade [s]ecrets to Cistus[] while employed by Knocking," and "soliciting Knocking's media and brand partners on behalf of Cistus." FAC ¶¶ 155–157. As discussed throughout this opinion, there is simply no evidence in the record to support Plaintiff's

claims. Plaintiff has not put forward an iota of proof that Pitcher's employment with Knocking precluded her from working with other companies in the industry, and there is insufficient evidence for a reasonable jury to conclude that Pitcher's status as an independent contractor would have entitled Knocking to fiduciary protections. Perhaps most critically, there is no evidence that Pitcher "stole" anything from Knocking (let alone trade secrets), nor is there evidence that she improperly misappropriated Knocking's "time, facilities, or proprietary secrets" while working for the company. *Island Sports Physical Therapy v. Bruns*, 84 A.D.3d 878, 878 (2d Dep't 2011); *see also supra* at 16–19. Defendants' motion for summary judgment on Plaintiff's breach of loyalty claim (Count VIII) is GRANTED.

**VIII. Breach of Covenant of Good Faith and Fair Dealing Claim (Count IX)**

Although Knocking claims that there is, *see* Pl. Opp. & Spol Mot. at 26–27, the Court sees no daylight between Plaintiff's breach of contract claim and its claim that Defendants breached the implied covenant of good faith and fair dealing. Both are based on the same factual circumstances (*i.e.*, the allegedly surreptitious exfiltration of Knocking's trade secrets and confidential data; Pitcher's solicitation of Knocking's brand partners on behalf of Cistus; and Pitcher's downloading Knocking materials to her personal computer), which, according to Knocking, constitute breaches of each Defendant's employment agreement. *Id.* at 26–27.[31] Because "New York . . . does not recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing when a breach of contract claim, based upon the same

---

[31] To be sure, Plaintiff argues that Pitcher's obligations also arise from a "course of dealing" with Knocking and notes that "Pitcher worked with Knocking for over six years, had access to its confidential systems and proprietary data, and was entrusted with sensitive brand partner information." Pl. Opp. & Spol. Mot. at 27. It is also true that "whether particular conduct violates or is consistent with the duty of good faith and fair dealing necessarily depends upon the facts of the particular case[] and is ordinarily a question of fact to be determined by the jury." *Id.* (quoting *Dreni v. PrinterOn Am. Corp.*, 486 F. Supp. 3d 712, 731 (S.D.N.Y. 2020)). But where a plaintiff fails to produce virtually any evidence that the Defendant engaged in the conduct alleged, the Court need not defer judgment. Such is the case here.

facts, is also pled," Knocking's New York common law claim necessarily fails. *Harris v. Provident Life & Accident Ins. Co.*, 310 F.3d 73, 81 (2d Cir. 2002).

Connecticut, like New York, does not recognize a cause of action for breach of the implied covenant of good faith and fair dealing that is entirely separate from breach of contract, but it does permit the claim to be pled alongside a breach of contract claim based on the same facts—provided the implied covenant claim alleges something more than a mere breach of contract, specifically bad faith conduct. *Kelly v. Kurtz*, 219 A.3d 948, 963 (Conn. App. 2019). For the reasons stated throughout this opinion, Plaintiff has not marshaled sufficient evidence from which a reasonable jury could conclude that either Carter or Pitcher acted in bad faith and misappropriated Plaintiff's alleged trade secrets. Defendants' motion for summary judgment on Plaintiff's breach of the covenant of good faith and fair dealing claim (Count IX) is GRANTED.

## IX. Plaintiff's Cross-Motion for Spoliation Sanctions

Plaintiff separately cross-moves for spoliation sanctions related to Pitcher's destroyed laptop and asks "that an adverse inference be granted, in its favor, finding, as a matter of law, that Pitcher misappropriated trade secrets." Pl. Opp. & Spol. Mot. at 28–29.

Although Plaintiff's opening motion cites to the rules governing spoliation sanctions under New York State law, *see* Pl. Opp. & Spol. Mot. at 28, Knocking appears to concede in its reply that (i) Federal Rule of Civil Procedure 37(e) (governing the failure to preserve electronically stored information ("ESI")) and (ii) the Court's inherent authority control, *see* Pl. Spol. Reply at 7–12; *see also CAT3, LLC v. Black Lineage, Inc.*, 164 F. Supp. 3d 488, 496–99 (S.D.N.Y. 2016).[32] Under Rule 37(e)(1), upon a finding that another party is prejudiced by the deletion of ESI, the Court "may order measures no greater than necessary to cure the prejudice."

[32] New York law governing the Court's authority to sanction parties is not applicable in this federal action.

Under Rule 37(e)(2), the Court may order punitive sanctions for spoliation or non-production of ESI upon a finding that the culpable party acted with the intent to deprive other parties of use of the withheld or lost documents. *See Hoffer v. Tellone*, 128 F.4th 433, 439–40 (2d Cir. 2025). A party seeking sanctions for alleged spoliation has the burden of establishing spoliation by at least a preponderance of the evidence. *CAT3*, 164 F. Supp. at 499.

Plaintiff has not met its burden here. "The threshold consideration in a spoliation analysis is determining when [the party's] duty to preserve evidence arose." *Medcenter Holdings Inc. v. Web MD Health Corp.*, 692 F. Supp. 3d 81, 90 (S.D.N.Y. 2023) (citing *Fujitsu Ltd. v. Fed. Exp. Corp.*, 247 F.3d 423, 436 (2d Cir. 2001)). Plaintiff claims that the Court should focus on Pitcher's disposal of her laptop in February 2025, after this lawsuit had commenced. Pl. Spol. Reply at 7–8. Defendant counters that the ESI Plaintiff seeks (*i.e.*, Knocking's documents allegedly downloaded to Pitcher's device) was deleted from the laptop in November 2024—before this litigation began, and thus before she had any duty to preserve such files. Def. Reply & Spol. Opp. at 22.

Neither argument is perfect, but Defendants' is more compelling. At bottom, "when the duty to preserve evidence arises" is "dependent upon the nature of the evidence." *Arista Records LLC v. Usenet.com, Inc.*, 608 F. Supp. 2d 409, 430 (S.D.N.Y. 2009). Here, Plaintiff wants the *contents* of Pitcher's laptop, not the laptop itself. Pitcher has sworn, under penalty of perjury, that ESI that may have been relevant to this case was deleted from her laptop as soon as she was terminated from Knocking in 2024. *See* Ex. SS, Dkt. 200-48 ¶¶ 4, 7–8. Plaintiff has introduced no evidence to contradict her statement. Accepting her representation as true, Pitcher was under

no duty to preserve the Knocking materials that purportedly existed on her computer when she expunged them from her laptop.[33]

The Court is also not swayed by Knocking's argument that the discovery it wanted (or would have been entitled to) was "the forensic metadata" associated with Pitcher's laptop, *i.e.*, data that was lost only when the computer was destroyed in February 2025. Pl. Spol. Reply at 8. That would suggest Knocking was seeking metadata *about* the purportedly spoliated ESI (*i.e.*, Pitcher's Knocking files). Defendants are correct that it is unlikely the Court would have entertained such an intrusive and attenuated request, which would have required a Court-ordered forensic examination of the laptop. *See* Def. Reply & Spol. Opp. at 24–25 (collecting cases).

There is also no evidence that Plaintiff was prejudiced by either event (*i.e.*, the November 2024 deletion of files or the February 2025 computer disposal). The theory that Plaintiff was harmed because it could not review the contents of the laptop is entirely speculative. During Pitcher's deposition, Knocking made no attempt to explore what Knocking documents Pitcher may have saved (but subsequently deleted) from her laptop. *See generally* Ex. D, Dkt. 200-7. Thus, there is no evidence, even circumstantial, that the documents Pitcher may have downloaded included confidential information, nor that they would have been relevant to Plaintiff's trade secrets claims (or any other claim asserted in this lawsuit).[34] There is also no evidence in the record that Pitcher improperly funneled the allegedly downloaded material to

---

[33] Indeed, because she apparently intended to work for a competitor, removing Knocking's data from her laptop at that time was perfectly reasonable.

[34] Plaintiff claims that "it cannot be disputed that the laptop held information relevant to this lawsuit." Pl. Opp. & Spol. Mot. at 28. That is not true. Defendants very much dispute that the laptop contained anything useful, and Plaintiff cannot point to any evidence that hints at the saliency of the materials alleged to have been on Pitcher's laptop. *See Best Payphones, Inc. v. City of N.Y.*, Nos. 1-CV-3294 (JG) (VMS), 1-CV-8506 (JG) (VMS), 3-CV-0192 (JG) (VMS), 2016 WL 792396, at *6 (E.D.N.Y. Feb. 26, 2016) (denying sanctions under Rule 37(e)(1) where defendants had not shown that deleted emails likely contained substantive information relevant to the legal issues in the case).

Carter, which one would reasonably expect given the nature of Plaintiff's misappropriation claims and Knocking's assertion that Defendants were actively using its crown jewels to devise a competing strategy for Cistus. *See* Def. Reply & Spol. Opp. at 22–23 ("[I]t is important to remember that Knocking's central claim against Pitcher is that she improperly shared information with Carter. Had Pitcher done so, all such evidence would have turned up in the myriad of other sources [] that the [] Defendants searched.").

In sum, Plaintiff has not met its burden to prove that spoliation sanctions against Pitcher are warranted. Indeed, Rule 37(e) sanctions are never permissible when predicated solely on a speculative theory that *potentially* relevant evidence *may* have been saved to—and deleted from—an electronic device. *See, e.g.*, *Karlyg v. City of N.Y.*, No. 20-CV-991 (PKC) (CLP), 2024 WL 4333858, at *8 (E.D.N.Y. 2024) ("[M]ere speculation . . . is insufficient to show that the loss of [ESI] is prejudicial to defendants."); *Goldman v. Sol Goldman Inv. LLC*, No. 20-CV-06727 (MKV) (SN), 2022 WL 2118199, at *4 (S.D.N.Y. June 11, 2022) ("[T]he mere fact that data has been lost or destroyed is not sufficient to support an inference that it would have been favorable to [d]efendants."); *Pugh-Ozua v. Springhill Suites*, No. 18-CV-01755 (RA), 2020 WL 6562376 at *4 (S.D.N.Y. Nov. 9, 2020) ("Plaintiff has not provided any evidence—aside from her own speculation—to support her argument that the text messages and emails would have corroborated her claims. Accordingly, . . .declining to grant sanctions under Rule 37(e)(1)" was appropriate).

Plaintiff's motion for spoliation sanctions is DENIED.

## CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is GRANTED as to all claims against Defendants Carter, Pitcher, and Cistus. Plaintiff's cross-motion for spoliation sanctions against Pitcher is DENIED.

The Clerk of Court is respectfully directed to enter judgment for Defendants, to terminate the open motions at Dkts. 111 and 169, and to CLOSE this case.

**SO ORDERED.**

**Date: September 30, 2026**
**New York, New York**

**VALERIE CAPRONI**
**United States District Judge**